## VARITY CORP. *v.* HOWE ET AL.

No. 94–1471.   Argued November 1, 1995—Decided March 19, 1996

490

BREYER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, KENNEDY, SOUTER, and GINSBURG, JJ., joined. THOMAS, J., filed a dissenting opinion, in which O'CONNOR and SCALIA, JJ., joined, *post*, p. 516.

*Floyd Abrams* argued the cause for petitioner. With him on the briefs were *Thomas J. Kavaler, Katherine B. Harrison, Jonathan Sherman,* and *William J. Koehn.*

*H. Richard Smith* argued the cause for respondents. With him on the brief were *David Swinton, Michael J. Eason,* and *Robert J. Schmit.*

*Deputy Solicitor General Kneedler* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Days, Richard P. Bress, Thomas S. Williamson, Jr., Allen H. Feldman, Steven J. Mandel, Mark S. Flynn,* and *Judith D. Heimlich.**

JUSTICE BREYER delivered the opinion of the Court.

A group of beneficiaries of a firm's employee welfare benefit plan, protected by the Employee Retirement Income Se-

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Evan Miller, John G. Roberts, Jr.,* and *Stephen A. Bokat;* and for the Eastman Kodak Co. et al. by *Robert N. Eccles.*

Briefs of *amici curiae* urging affirmance were filed for the American Association of Retired Persons by *Steven S. Saleznick* and *Mary Ellen Signorille;* and for the National Employment Lawyers Association by *Stephen R. Bruce, Jeffrey Lewis, Ronald Dean,* and *Edgar Pauk.*

Briefs of *amici curiae* were filed for the Central States, Southeast and Southwest Areas Health and Welfare and Pension Fund by *Thomas C. Nyhan* and *Terence G. Craig;* and for the National Association of Securities and Commercial Law Attorneys by *Kevin P. Roddy, Jonathan W. Cuneo, Bryan L. Clobes, Stephen P. Hoffman, Henry H. Rossbacher,* and *Steve W. Berman.*

curity Act of 1974 (ERISA), 88 Stat. 832, as amended, 29 U. S. C. § 1001 *et seq.* (1988 ed.), have sued their plan's administrator, who was also their employer. They claim that the administrator, through trickery, led them to withdraw from the plan and to forfeit their benefits. They seek, among other things, an order that, in essence, would reinstate each of them as a participant in the employer's ERISA plan. The lower courts entered judgment in the employees' favor, and we agreed to review that judgment.

In conducting our review, we do not question the lower courts' findings of serious deception by the employer, but instead consider three legal questions. First, in the factual circumstances (as determined by the lower courts), was the employer acting in its capacity as an ERISA "fiduciary" when it significantly and deliberately misled the beneficiaries? Second, in misleading the beneficiaries, did the employer violate the fiduciary obligations that ERISA § 404 imposes upon plan administrators? Third, does ERISA § 502(a)(3) authorize ERISA plan beneficiaries to bring a lawsuit, such as this one, that seeks relief for individual beneficiaries harmed by an administrator's breach of fiduciary obligations?

We answer each of these questions in the beneficiaries' favor, and we therefore affirm the judgment of the Court of Appeals.

I

The key facts, as found by the District Court after trial, include the following: Charles Howe, and the other respondents, used to work for Massey-Ferguson, Inc., a farm equipment manufacturer, and a wholly owned subsidiary of the petitioner, Varity Corporation. (Since the lower courts found that Varity and Massey-Ferguson were "alter egos," we shall refer to them interchangeably.) These employees all were participants in, and beneficiaries of, Massey-Ferguson's self-funded employee welfare benefit plan—an ERISA-protected plan that Massey-Ferguson itself administered. In the mid-1980's, Varity became concerned that

some of Massey-Ferguson's divisions were losing too much money and developed a business plan to deal with the problem.

The business plan—which Varity called "Project Sunshine"—amounted to placing many of Varity's money-losing eggs in one financially rickety basket. It called for a transfer of Massey-Ferguson's money-losing divisions, along with various other debts, to a newly created, separately incorporated subsidiary called Massey Combines. The plan foresaw the possibility that Massey Combines would fail. But it viewed such a failure, from Varity's business perspective, as closer to a victory than to a defeat. That is because Massey Combine's failure would not only eliminate several of Varity's poorly performing divisions, but it would also eradicate various debts that Varity would transfer to Massey Combines, and which, in the absence of the reorganization, Varity's more profitable subsidiaries or divisions might have to pay.

Among the obligations that Varity hoped the reorganization would eliminate were those arising from the Massey-Ferguson benefit plan's promises to pay medical and other nonpension benefits to employees of Massey-Ferguson's money-losing divisions. Rather than terminate those benefits directly (as it had retained the right to do), Varity attempted to avoid the undesirable fallout that could have accompanied cancellation by inducing the failing divisions' employees to switch employers and thereby voluntarily release Massey-Ferguson from its obligation to provide them benefits (effectively substituting the new, self-funded Massey Combines benefit plan for the former Massey-Ferguson plan). Insofar as Massey-Ferguson's employees did so, a subsequent Massey Combines failure would eliminate—simply and automatically, without distressing the remaining Massey-Ferguson employees—what would otherwise have been Massey-Ferguson's obligation to pay those employees their benefits.

To persuade the employees of the failing divisions to accept the change of employer and benefit plan, Varity called

them together at a special meeting and talked to them about Massey Combines' future business outlook, its likely financial viability, and the security of their employee benefits. The thrust of Varity's remarks (which we shall discuss in greater detail *infra*, at 499–501) was that the employees' benefits would remain secure if they voluntarily transferred to Massey Combines. As Varity knew, however, the reality was very different. Indeed, the District Court found that Massey Combines was insolvent from the day of its creation and that it hid a $46 million negative net worth by overvaluing its assets and underestimating its liabilities.

After the presentation, about 1,500 Massey-Ferguson employees accepted Varity's assurances and voluntarily agreed to the transfer. (Varity also unilaterally assigned to Massey Combines the benefit obligations it owed to some 4,000 workers who had retired from Massey-Ferguson prior to this reorganization, without requesting permission or informing them of the assignment.) Unfortunately for these employees, Massey Combines ended its first year with a loss of $88 million, and ended its second year in a receivership, under which its employees lost their nonpension benefits. Many of those employees (along with several retirees whose benefit obligations Varity had assigned to Massey Combines and others whose claims we do not now consider) brought this lawsuit, seeking the benefits they would have been owed under their old, Massey-Ferguson plan, had they not transferred to Massey Combines.

After trial, the District Court found, among other things, that Varity and Massey-Ferguson, acting as ERISA fiduciaries, had harmed the plan's beneficiaries through deliberate deception. The court held that Varity and Massey-Ferguson thereby violated an ERISA-imposed fiduciary obligation to administer Massey-Ferguson's benefit plan "solely in the interest of the participants and beneficiaries" of the plan. ERISA § 404(a). The court added that ERISA § 502(a)(3) gave the former Massey-Ferguson employees a

right to "appropriate equitable relief . . . to redress" the harm that this deception had caused them individually. Among other remedies the court considered "appropriate equitable relief" was an order that Massey-Ferguson reinstate its former employees into its own plan (which had continued to provide benefits to employees of Massey-Ferguson's profitable divisions). The court also ordered certain monetary relief which is not at issue here. The Court of Appeals later affirmed the District Court's determinations, in relevant part. 36 F. 3d 746 (CA8 1994).

We granted certiorari in this case primarily because the Courts of Appeals have disagreed about the proper interpretation of ERISA § 502(a)(3), the provision the District Court held authorized the lawsuit and relief in this case. Some Courts of Appeals have held that this section, when applied to a claim of breach of fiduciary obligation, does not authorize awards of relief to individuals, but instead only authorizes suits to obtain relief for the *plan* (as, for example, when a beneficiary sues in a representative capacity, seeking to compel a dishonest fiduciary to return embezzled funds to the plan). See *McLeod* v. *Oregon Lithoprint Inc.*, 46 F. 3d 956 (CA9 1995); *Simmons* v. *Southern Bell Telephone and Telegraph Co.*, 940 F. 2d 614 (CA11 1991). Other Courts of Appeals, such as the Eighth Circuit in this case, have not read any such limitation into the statute. See *Bixler* v. *Central Pennsylvania Teamsters Health & Welfare Fund*, 12 F. 3d 1292 (CA3 1993); *Anweiler* v. *American Electric Power Service Corp.*, 3 F. 3d 986 (CA7 1993).

Varity has raised two additional issues. First, Varity points out that the relevant ERISA section imposes liability only upon plan *fiduciaries;* and it argues that it was acting only as an *employer* and not as a plan *fiduciary* when it deceived its employees. Second, it argues that, in any event, its conduct did not violate the fiduciary standard that ERISA imposes.

We consider all three issues to be fairly within the scope of the questions that Varity posed in its petition for certiorari, although only with respect to the workers who were deceived by Varity, for as we construe Varity's petition, it does not sufficiently call into question the District Court's holding that Varity breached a fiduciary duty with respect to the Massey-Ferguson retirees whose benefit obligations had been involuntarily assigned to Massey Combines. With these limitations in mind, we turn to the questions presented.

## II

ERISA protects employee pensions and other benefits by providing insurance (for vested pension rights, see ERISA § 4001 *et seq.*), specifying certain plan characteristics in detail (such as when and how pensions vest, see §§ 201–211), and by setting forth certain general fiduciary duties applicable to the management of both pension and nonpension benefit plans. See § 404. In this case, we interpret and apply these general fiduciary duties and several related statutory provisions.

In doing so, we recognize that these fiduciary duties draw much of their content from the common law of trusts, the law that governed most benefit plans before ERISA's enactment. See *Central States, Southeast & Southwest Areas Pension Fund* v. *Central Transport, Inc.*, 472 U. S. 559, 570 (1985) ("[R]ather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility"); H. R. Rep. No. 93–533, pp. 3–5, 11–13 (1973), 2 Legislative History of the Employee Retirement Income Security Act of 1974 (Committee Print compiled for the Senate Subcommittee on Labor of the Committee on Labor and Public Welfare by the Library of Congress), Ser. No. 93–406, pp. 2350–2352, 2358–2360 (1976) (hereinafter Leg. Hist.); G. Bogert & G. Bogert, Law of Trusts and Trustees § 255, p. 343 (rev. 2d ed. 1992).

We also recognize, however, that trust law does not tell the entire story. After all, ERISA's standards and procedural protections partly reflect a congressional determination that the common law of trusts did not offer completely satisfactory protection. See ERISA §2(a). See also H. R. Rep. No. 93–533, *supra,* at 3–5, 11–13, 2 Leg. Hist. 2350–2352; 2358–2360; H. R. Conf. Rep. No. 93–1280, pp. 295, 302 (1974), 3 Leg. Hist. 4562, 4569. And, even with respect to the trust-like fiduciary standards ERISA imposes, Congress "expect[ed] that the courts will interpret this prudent man rule (and the other fiduciary standards) bearing in mind the special nature and purpose of employee benefit plans," *id.,* at 302, 3 Leg. Hist. 4569, as they "develop a 'federal common law of rights and obligations under ERISA-regulated plans.'" *Firestone Tire & Rubber Co.* v. *Bruch,* 489 U. S. 101, 110–111 (1989) (quoting *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S. 41, 56 (1987)).

Consequently, we believe that the law of trusts often will inform, but will not necessarily determine the outcome of, an effort to interpret ERISA's fiduciary duties. In some instances, trust law will offer only a starting point, after which courts must go on to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common-law trust requirements. And, in doing so, courts may have to take account of competing congressional purposes, such as Congress' desire to offer employees enhanced protection for their benefits, on the one hand, and, on the other, its desire not to create a system that is so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefit plans in the first place. Compare ERISA §2 with *Curtiss-Wright Corp.* v. *Schoonejongen,* 514 U. S. 73, 78–81 (1995), and *Mertens* v. *Hewitt Associates,* 508 U. S. 248, 262–263 (1993).

We have followed this approach when interpreting, and applying, the statutory provisions here before us.

## A

We begin with the question of Varity's fiduciary status. In relevant part, the statute says that a "person is a fiduciary with respect to a plan," and therefore subject to ERISA fiduciary duties, "to the extent" that he or she "exercises any discretionary authority or discretionary control respecting management" of the plan, or "has any discretionary authority or discretionary responsibility in the administration" of the plan.   ERISA § 3(21)(A).

Varity was *both* an employer *and* the benefit plan's administrator, as ERISA permits.   Compare ERISA § 3(16) (employer is, in some circumstances, the default plan administrator) with *NLRB* v. *Amax Coal Co.,* 453 U. S. 322, 329–330 (1981) (common law of trusts prohibits fiduciaries from holding positions that create conflict of interest with trust beneficiaries); Bogert & Bogert, *supra,* § 543, at 218, 264 (same). But, obviously, not all of Varity's business activities involved plan management or administration.   Varity argues that when it communicated with its Massey-Ferguson workers about transferring to Massey Combines, it was not administering or managing the plan; rather, it was acting only in its capacity as an *employer* and not as a plan *administrator.*

The District Court, however, held that when the misrepresentations regarding employee benefits were made, Varity was wearing its "fiduciary," as well as its "employer," hat. In reviewing this legal conclusion, we give deference to the factual findings of the District Court, recognizing its comparative advantage in understanding the specific context in which the events of this case occurred.   We believe that these factual findings (which Varity does not challenge) adequately support the District Court's holding that Varity was exercising "discretionary authority" respecting the plan's "management" or "administration" when it made these misrepresentations, which legal holding we have independently reviewed.

The relevant factual circumstances include the following: In the spring of 1986, Varity summoned the employees of Massey-Ferguson's money-losing divisions to a meeting at Massey-Ferguson's corporate headquarters for a 30-minute presentation. The employees saw a 90-second videotaped message from Mr. Ivan Porter, a Varity vice president and Massey Combines' newly appointed president. They also received four documents: (a) a several-page, detailed comparison between the employee benefits offered by Massey-Ferguson and those offered by Massey Combines; (b) a question-and-answer sheet; (c) a transcript of the Porter videotape; and (d) a cover letter with an acceptance form. Each of these documents discussed employee benefits and benefit plans, some briefly in general terms, and others at length and in detail:

(a) The longest document, the side-by-side benefits comparison, contained a fairly detailed description of the benefit plans. Its object was to show that after transfer, the employees' benefits would remain the same. It says, for example, that, under Massey-Ferguson's plan, "[d]iagnostic x-ray and laboratory expenses will be paid on the basis of reasonable and customary charges for such services." App. 70. It then repeats the same sentence in describing Massey Combines' "[d]iagnostic x-ray and laboratory expenses" benefits. *Ibid.* It describes about 20 different benefits in this way.

(b) The eight questions and answers on the question-and-answer sheet include three that relate to welfare benefits or to the ERISA pension plan Varity also administered:

"Q. 3. What happens to my benefits, pension, etc.?

"A. 3. When you transfer to MCC [Massey Combines], pay levels and benefit programmes will remain unchanged. There will be no loss of seniority or pensionable service.

"Q. 4. Do you expect the terms and conditions of employment to change?

"A. 4. Employment conditions in the future will depend on our ability to make Massey Combines Corporation a success and if changes are considered necessary or appropriate, they will be made.

. . . . .

"Q. 8. Are the pensions protected under MCC?
"A. 8. Responsibility for pension benefits earned by employees transferring to Massey Combines Corporation is being assumed by the Massey Combines Corporation Pension Plan.

"The assets which are held in the Massey Ferguson Pension Plan to fund such benefits as determined by actuarial calculations, are being transferred to the Massey Combines Corporation Plan. Such benefits and assets will be protected by the same legislation that protect the Massey Ferguson Pension Plan.

"There will be no change in pension benefits as a result of your transfer to Massey Combines Corporation."
*Id.*, at 75–77.

(c) The transcript of the 90-second videotape message repeated much of the information in the question-and-answer sheet, adding assurances about Massey Combines' viability:

"This financial restructuring created Massey Combines Corporation and will provide the funds necessary to ensure its future viability. I believe that with the continued help and support of you we can make Massey Combines Corporation the kind of successful business enterprise which we all want to work for.

". . . . When you transfer your employment to the Massey Combines Corporation, pay levels and benefit programs will remain unchanged. There will be no loss of seniority or pensionable service. Employment conditions in the future will depend on the success of the Massey Combines Corporation and should changes be deemed appropriate or necessary, they will be made. . . .

"Finally, despite the depression which persists in the North American economy, I am excited about the future of Massey Combines Corporation." *Id.*, at 80.

(d) The cover letter, in five short paragraphs, repeated verbatim these benefit-related assurances:

"To enable us to accept you as an employee of Massey Combines Corporation and to continue to process the payment of benefits to you, we require that you complete the information below and return this letter . . . .

"When you accept employment with Massey Combines Corporation, pay levels and benefit programs will remain unchanged. There will be no loss of seniority or pensionable service. Employment conditions in the future will depend on our ability to make Massey Combines Corporation a success, and if changes are considered necessary or appropriate, they will be made.

"We are all very optimistic that our new company, has a bright future, and are excited by the new challenges facing all of us. . . .

"In order to ensure uninterrupted continuation of your pay and benefits, please return this signed acceptance of employment . . . ." *Id.*, at 82–83.

Given this record material, the District Court determined, as a factual matter, that the key meeting, to a considerable extent, was about benefits, for the documents described them in detail, explained the similarity between past and future plans in principle, and assured the employees that they would continue to receive similar benefits in practice. The District Court concluded that the basic message conveyed to the employees was that transferring from Massey-Ferguson to Massey Combines would not significantly undermine the security of their benefits. And, given this view of the facts, we believe that the District Court reached the correct legal conclusion, namely, that Varity spoke, in significant part, in its capacity as plan administrator.

To decide whether Varity's actions fall within the statutory definition of "fiduciary" acts, we must interpret the statutory terms which limit the scope of fiduciary activity to discretionary acts of plan "management" and "administration." ERISA § 3(21)(A). These words are not self-defining, and the activity at issue here neither falls clearly within nor outside of the common understanding of these words. The dissent looks to the dictionary for interpretive assistance. See *post*, at 528–529. Though dictionaries sometimes help in such matters, we believe it more important here to look to the common law, which, over the years, has given to terms such as "fiduciary" and trust "administration" a legal meaning to which, we normally presume, Congress meant to refer. See, *e. g., Nationwide Mut. Ins. Co.* v. *Darden,* 503 U. S. 318, 322 (1992). The ordinary trust law understanding of fiduciary "administration" of a trust is that to act as an administrator is to perform the duties imposed, or exercise the powers conferred, by the trust documents. See Restatement (Second) of Trusts § 164 (1957); 76 Am. Jur. 2d, Trusts § 321 (1992). Cf. ERISA § 404(a). The law of trusts also understands a trust document to implicitly confer "such powers as are necessary or appropriate for the carrying out of the purposes" of the trust. 3 A. Scott & W. Fratcher, Law of Trusts § 186, p. 6 (4th ed. 1988). See also Bogert & Bogert, Law of Trusts and Trustees § 551, at 41; *Central States,* 472 U. S., at 570. Conveying information about the likely future of plan benefits, thereby permitting beneficiaries to make an informed choice about continued participation, would seem to be an exercise of a power "appropriate" to carrying out an important plan purpose. After all, ERISA itself specifically requires administrators to give beneficiaries certain information about the plan. See, *e. g.,* ERISA §§ 102, 104(b)(1), 105(a). And administrators, as part of their administrative responsibilities, frequently offer beneficiaries more than the minimum information that the statute requires—for example, answering beneficiaries' questions about the meaning of

the terms of a plan so that those beneficiaries can more easily obtain the plan's benefits. To offer beneficiaries detailed plan information in order to help them decide whether to remain with the plan is essentially the same kind of plan-related activity. Cf. Restatement (Second) of Agency § 229(1) (1957) (determining whether an activity is within the "scope of . . . employment" in part by examining whether it is "of the same general nature as that authorized").

Moreover, as far as the record reveals, Mr. Porter's letter, videotape, and the other documents came from those within the firm who had authority to communicate as fiduciaries with plan beneficiaries. Varity does not claim that it authorized only special individuals, not connected with the meeting documents, to speak as plan administrators. See § 402(b)(2) (a plan may describe a "procedure under the plan for the allocation of responsibilities for the operation and administration of the plan").

Finally, reasonable employees, in the circumstances found by the District Court, could have thought that Varity was communicating with them *both* in its capacity as employer *and* in its capacity as plan administrator. Reasonable employees might not have distinguished consciously between the two roles. But they would have known that the employer was their plan's administrator and had expert knowledge about how their plan worked. The central conclusion ("your benefits are secure") could well have drawn strength from their awareness of that expertise, and one could reasonably believe that the employer, aware of the importance of the matter, so intended.

We conclude, therefore, that the factual context in which the statements were made, combined with the plan-related nature of the activity, engaged in by those who had plan-related authority to do so, together provide sufficient support for the District Court's legal conclusion that Varity was acting as a fiduciary.

Varity raises three contrary arguments. First, Varity argues that it was not engaged in plan administration because neither the specific disclosure provisions of ERISA, nor the specific terms of the plan instruments, App. 5–26, *required* it to make these statements. But that does not mean Varity was not engaging in plan administration in making them, as the dissent seems to suggest. See *post*, at 531–532, and n. 12. There is more to plan (or trust) administration than simply complying with the specific duties imposed by the plan documents or statutory regime; it also includes the activities that are "ordinary and natural means" of achieving the "objective" of the plan. Bogert & Bogert, *supra*, § 551, at 41–52. Indeed, the primary function of the fiduciary duty is to constrain the exercise of *discretionary* powers which are controlled by no other specific duty imposed by the trust instrument or the legal regime. If the fiduciary duty applied to nothing more than activities already controlled by other specific legal duties, it would serve no purpose.

Second, Varity says that when it made the statements that most worried the District Court—the statements about Massey Combines' "bright future"—it must have been speaking only as employer (and not as fiduciary), for statements about a new subsidiary's financial future have virtually nothing to do with administering benefit plans. But this argument parses the meeting's communications too finely. The ultimate message Varity intended to convey—"your benefits are secure"—depended in part upon its repeated assurances that benefits would remain "unchanged," in part upon the detailed comparison of benefits, and in part upon assurances about Massey Combines' "bright" financial future. Varity's workers would not necessarily have focused upon each underlying supporting statement separately, because what primarily interested them, and what primarily interested the District Court, was the truthfulness of the ultimate conclusion that transferring to Massey Combines would not ad-

versely affect the security of their benefits. And, in the present context (see *supra*, at 499–501), Varity's statements about the security of benefits amounted to an act of plan administration. That Varity intentionally communicated its conclusion through a closely linked set of statements (some directly concerning plan benefits, others concerning the viability of the corporation) does not change this conclusion.

We do not hold, as the dissent suggests, *post*, at 529–531, that Varity acted as a fiduciary simply because it made statements about its expected financial condition or because "an ordinary business decision turn[ed] out to have an adverse impact on the plan." *Post*, at 539. Instead, we accept the undisputed facts found, and factual inferences drawn, by the District Court, namely, that Varity *intentionally* connected its statements about Massey Combines' financial health to statements it made about the future of benefits, so that its intended communication about the security of benefits was rendered materially misleading. See App. to Pet. for Cert. 64a–65a, ¶¶ 65, 68. And we hold that making intentional representations about the future of plan benefits in that context is an act of plan administration.

Third, Varity says that an employer's decision to amend or terminate a plan (as Varity had the right to do) is not an act of plan administration. See *Curtiss-Wright Corp.*, 514 U. S., at 78–81. How then, it asks, could conveying information about the likelihood of termination be an act of plan administration? While it may be true that amending or terminating a plan (or a common-law trust) is beyond the power of a plan administrator (or trustee)— and, therefore, cannot be an act of plan "management" or "administration"—it does not follow that making statements about the likely future of the plan is also beyond the scope of plan administration. As we explained above, plan administrators often have, and commonly exercise, discretionary authority to communicate with beneficiaries about the future of plan benefits.

## B

The second question—whether Varity's deception violated ERISA-imposed fiduciary obligations—calls for a brief, affirmative answer. ERISA requires a "fiduciary" to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." ERISA § 404(a). To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act "solely in the interest of the participants and beneficiaries." As other courts have held, "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA," *Peoria Union Stock Yards Co.* v. *Penn Mut. Life Ins. Co.,* 698 F. 2d 320, 326 (CA7 1983). See also *Central States,* 472 U. S., at 570–571 (ERISA fiduciary duty includes common-law duty of loyalty); Bogert & Bogert, Law of Trusts and Trustees § 543, at 218–219 (duty of loyalty requires trustee to deal fairly and honestly with beneficiaries); 2A Scott & Fratcher, Law of Trusts § 170, pp. 311–312 (same); Restatement (Second) of Trusts § 170 (same). Because the breach of this duty is sufficient to uphold the decision below, we need not reach the question whether ERISA fiduciaries have any fiduciary duty to disclose truthful information on their own initiative, or in response to employee inquiries.

We recognize, as mentioned above, that we are to apply common-law trust standards "bearing in mind the special nature and purpose of employee benefit plans." H. R. Conf. Rep. No. 93–1280, at 302, 3 Leg. Hist. 4569. But we can find no adequate basis here, in the statute or otherwise, for any special interpretation that might insulate Varity, acting as a fiduciary, from the legal consequences of the kind of conduct (intentional misrepresentation) that often creates liability even among strangers.

We are aware, as Varity suggests, of one possible reason for a departure from ordinary trust law principles. In arguing about ERISA's remedies for breaches of fiduciary obli-

gation, Varity says that Congress intended ERISA's fiduciary standards to protect only the financial integrity of the plan, not individual beneficiaries. This intent, says Varity, is shown by the fact that Congress did not provide remedies for individuals harmed by such breaches; rather, Congress limited relief to remedies that would benefit only the plan itself. This argument fails, however, because, in our view, Congress *did* provide remedies for individual beneficiaries harmed by breaches of fiduciary duty, as we shall next discuss.

## C

The remaining question before us is whether or not the remedial provision of ERISA that the beneficiaries invoked, ERISA § 502(a)(3), authorizes this lawsuit for individual relief. That subsection is the third of six subsections contained within ERISA's "Civil Enforcement" provision (as it stood at the times relevant to this lawsuit):

"Sec. 502. (a) A civil action may be brought—
  "(1) by a participant or beneficiary—
    "(A) for the relief provided for in subsection (c) of this section [providing for liquidated damages for failure to provide certain information on request], or
    "(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
  "(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 409 [entitled "Liability for Breach of Fiduciary Duty"];
  "*(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan;*

"(4) by the Secretary, or by a participant, or beneficiary for appropriate relief in the case of a violation of 105(c) [requiring disclosure of certain tax registration statements];

"(5) except as otherwise provided in subsection (b), by the Secretary (A) to enjoin any act or practice which violates any provision of this title, or (B) to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of this title; or

"(6) by the Secretary to collect any civil penalty under subsection (i)." ERISA § 502(a), 88 Stat. 891, 29 U. S. C. § 1132(a) (1988 ed.) (emphasis added).

The District Court held that the third subsection, which we have italicized, authorized this suit and the relief awarded. Varity concedes that the plaintiffs satisfy most of this provision's requirements, namely, that the plaintiffs are plan "participants" or "beneficiaries," and that they are suing for "equitable" relief to "redress" a violation of § 404(a), which is a "provision of this title." Varity does not agree, however, that this lawsuit seeks equitable relief that is "*appropriate.*" In support of this conclusion, Varity makes a complicated, four-step argument:

*Step One:* Section 502(a)'s *second* subsection says that a plaintiff may bring a civil action "for appropriate relief under section 409."

*Step Two:* Section 409(a), in turn, reads:

"Liability for Breach of Fiduciary Duty

Sec. 409. (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to *make good to such plan any losses to the plan* resulting from each such breach, and to *restore to such plan any profits* of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such *other equi-*

*table or remedial relief* as the court may deem appropriate, including removal of such fiduciary. . . ." (Emphasis added.)

*Step Three:* In *Massachusetts Mut. Life Ins. Co.* v. *Russell,* 473 U. S. 134 (1985), this Court pointed to the above-italicized language in § 409 and concluded that this section (and its companion remedial provision, subsection (2)) did not authorize the plaintiff's suit for compensatory and punitive damages against an administrator who had wrongfully delayed payment of her benefit claim. The first two italicized phrases, the Court said, show that § 409's "draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the *entire plan,* rather than with the rights of an individual beneficiary." *Id.,* at 142 (emphasis added). The Court added that, in this context, the last italicized phrase ("other equitable or remedial relief") does not "authorize any relief except for the plan itself." *Id.,* at 144.

*Step Four:* In light of *Russell,* as well as ERISA's language, structure, and purposes, one cannot read the *third* subsection (the subsection before us) as *including* (as "appropriate") the very kind of action—an action for individual, rather than plan, relief—that this Court found Congress *excluded* in subsection (2). It is at this point, however, that we must disagree with Varity. We have reexamined *Russell,* as well as the relevant statutory language, structure, and purpose. And, in our view, they support the beneficiaries' view of the statute, not Varity's.

First, *Russell* discusses § 502(a)'s *second* subsection, not its *third* subsection, and the language that the Court found limiting appears in a statutory section (§ 409) that the *second* subsection, not the *third,* cross-references. *Russell*'s plaintiff expressly disavowed reliance on the third subsection, *id.,* at 139, n. 5, perhaps because she was seeking compensatory and punitive damages and subsection (3) authorizes only "equitable" relief. See *Mertens,* 508 U. S., at 255, 256–258, and

n. 8 (compensatory and punitive damages are not "equitable relief" within the meaning of subsection (3)); ERISA § 409(a) (authorizing "other equitable *or remedial* relief") (emphasis added). Further, *Russell* involved a complicating factor not present here, in that another remedial provision (subsection *(1)*) already provided specific relief for the sort of injury the plaintiff had suffered (wrongful denial of benefits), but said "nothing about the recovery of extracontractual damages, or about the possible consequences of delay in the plan administrators' processing of a disputed claim." *Russell, supra,* at 144. These differences lead us to conclude that *Russell* does not control, either implicitly or explicitly, the outcome of the case before us.

Second, subsection (3)'s language does not favor Varity. The words of subsection (3)—"appropriate equitable relief" to "redress" any "act or practice which violates any provision of this title"—are broad enough to cover individual relief for breach of a fiduciary obligation. Varity argues that the title of § 409—"Liability for Breach of Fiduciary Duty"—means that § 409 (and its companion, subsection (2)) cover *all* such liability. But that is not what the title or the provision says. And other language in the statute suggests the contrary. Section 502(l), added in 1989, calculates a certain civil penalty as a percentage of the sum "ordered by a court to be paid by such fiduciary . . . to a plan *or its participants and beneficiaries*" under subsection (5). Subsection (5) is identical to subsection (3), except that it authorizes suits by the Secretary, rather than the participants and beneficiaries. Compare § 502(a)(3) with § 502(a)(5). This new provision, therefore, seems to foresee instances in which the sort of relief provided by both subsection (5) and, by implication, subsection (3), would include an award to "participants and beneficiaries," rather than to the "plan," for breach of fiduciary obligation.

Third, the statute's structure offers Varity little support. Varity notes that the *second* subsection refers specifically

(through its §409 cross-reference) to breaches of fiduciary duty, while the *third* subsection refers, as a kind of "catch-all," to all ERISA Title One violations. And it argues that a canon of statutory construction, namely "the specific governs over the general," means that the more specific *second* (fiduciary breach) subsection makes the more general *third* (catchall) subsection inapplicable to claims of fiduciary breach. Canons of construction, however, are simply "rules of thumb" which will sometimes "help courts determine the meaning of legislation." *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253 (1992). To apply a canon properly one must understand its rationale. This Court has understood the present canon ("the specific governs the general") as a warning against applying a general provision when doing so would undermine limitations created by a more specific provision. See, *e. g.*, *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 384–385 (1992); *HCSC-Laundry* v. *United States*, 450 U. S. 1, 6, 8 (1981); *Fourco Glass Co.* v. *Transmirra Products Corp.*, 353 U. S. 222, 228–229 (1957). Yet, in this case, why should one believe that Congress intended the specific remedies in §409 as a *limitation?*

To the contrary, one can read §409 as reflecting a special congressional concern about plan asset management without also finding that Congress intended that section to contain the exclusive set of remedies for every kind of fiduciary breach. After all, ERISA makes clear that a fiduciary has obligations other than, and in addition to, managing plan assets. See §3(21)(A) (defining "fiduciary" as one who "exercises any discretionary authority . . . respecting management of such plan *or* . . . respecting management or disposition of its assets") (emphasis added). For example, as the dissent concedes, *post*, at 530, a plan administrator engages in a fiduciary act when making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents. See §404(a)(1)(D); Dept. of Labor, Interpretive Bulletin 75–8, 29 CFR §2509.75–8 (1995)

("[A] plan employee who has the final authority to authorize or disallow benefit payments in cases where a dispute exists as to the interpretation of plan provisions . . . would be a fiduciary"); *Moore* v. *Reynolds Metals Co. Retirement Program*, 740 F. 2d 454, 457 (CA6 1984); *Birmingham* v. *Sogen-Swiss Intern. Corp. Retirement Plan*, 718 F. 2d 515, 521–522 (CA2 1983). And, as the Court pointed out in *Russell*, 473 U. S., at 144, ERISA specifically provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims, one that is outside the framework of the *second* subsection and cross-referenced § 409, and one that runs directly to the injured beneficiary. § 502(a)(1)(B). See also *Firestone*, 489 U. S., at 108. Why should we not conclude that Congress provided yet other remedies for yet other breaches of other sorts of fiduciary obligation in another, "catchall" remedial section?

Such a reading is consistent with § 502's overall structure. Four of that section's six subsections focus upon specific areas, *i. e.*, the first (wrongful denial of benefits and information), the second (fiduciary obligations related to the plan's financial integrity), the fourth (tax registration), and the sixth (civil penalties). The language of the other two subsections, the third and the fifth, creates two "catchalls," providing "appropriate equitable relief" for "any" statutory violation. This structure suggests that these "catchall" provisions act as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy. And, contrary to Varity's argument, there is nothing in the legislative history that conflicts with this interpretation. See S. Rep. No. 93–127, p. 35 (1973), 1 Leg. Hist. 621 (describing Senate version of enforcement provisions as intended to "provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations of [ERISA]"); H. R. Rep. No. 93–533, at 17, 2 Leg. Hist. 2364 (describing House version in identical terms).

Fourth, ERISA's basic purposes favor a reading of the *third* subsection that provides the plaintiffs with a remedy. The statute itself says that it seeks

> "to protect . . . the interests of participants . . . and . . . beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries . . . and . . . providing for appropriate remedies . . . and ready access to the Federal courts." ERISA § 2(b).

Section 404(a), in furtherance of this general objective, requires fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries." Given these objectives, it is hard to imagine why Congress would want to immunize breaches of fiduciary obligation that harm individuals by denying injured beneficiaries a remedy.

*Amici* supporting Varity find a strong contrary argument in an important, subsidiary congressional purpose—the need for a sensible administrative system. They say that holding that the Act permits individuals to enforce fiduciary obligations owed directly to them as individuals threatens to increase the cost of welfare benefit plans and thereby discourage employers from offering them. Consider a plan administrator's decision not to pay for surgery on the ground that it falls outside the plan's coverage. At present, courts review such decisions with a degree of deference to the administrator, provided that "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone, supra,* at 115. But what will happen, ask *amici,* if a beneficiary can repackage his or her "denial of benefits" claim as a claim for "breach of fiduciary duty?" Wouldn't a court, they ask, then have to forgo deference and hold the administrator to the "rigid level of conduct" expected of fiduciaries? And, as a consequence, would there not then be two "incompatible legal standards for courts hearing benefit claim disputes" depending upon whether the beneficiary

claimed simply "denial of benefits," or a virtually identical "breach of fiduciary duty?" See Brief for Chamber of Commerce as *Amicus Curiae* 10. Consider, too, they add, a medical review board trying to decide whether certain proposed surgery is medically necessary. Will the board's awareness of a "duty of loyalty" to the surgery-seeking beneficiary not risk inadequate attention to the countervailing, but important, need to constrain costs in order to preserve the plan's funds? *Id.*, at 11.

Thus, *amici* warn that a legally enforceable duty of loyalty that extends beyond plan asset management to individual beneficiaries will risk these and other adverse consequences. Administrators will tend to interpret plan documents as requiring payments to individuals instead of trying to preserve plan assets; nonexpert courts will try to supervise too closely, and second guess, the often technical decisions of plan administrators; and, lawyers will complicate ordinary benefit claims by dressing them up in "fiduciary duty" clothing. The need to avoid these consequences, they conclude, requires us to accept Varity's position.

The concerns that *amici* raise seem to us unlikely to materialize, however, for several reasons. First, a fiduciary obligation, enforceable by beneficiaries seeking relief for themselves, does not necessarily favor payment over nonpayment. The common law of trusts recognizes the need to preserve assets to satisfy future, as well as present, claims and requires a trustee to take impartial account of the interests of all beneficiaries. See Restatement (Second) of Trusts § 183 (discussing duty of impartiality); *id.*, § 232 (same).

Second, characterizing a denial of benefits as a breach of fiduciary duty does not necessarily change the standard a court would apply when reviewing the administrator's decision to deny benefits. After all, *Firestone*, which authorized deferential court review when the plan itself gives the administrator discretionary authority, based its decision upon

the same common-law trust doctrines that govern standards of fiduciary conduct. See Restatement (Second) of Trusts § 187 ("Where discretion is conferred upon the trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent an abuse by the trustee of his discretion") (as quoted in *Firestone*, 489 U. S., at 111).

Third, the statute authorizes "*appropriate*" equitable relief. We should expect that courts, in fashioning "appropriate" equitable relief, will keep in mind the "special nature and purpose of employee benefit plans," and will respect the "policy choices reflected in the inclusion of certain remedies and the exclusion of others." *Pilot Life Ins. Co.*, 481 U. S., at 54. See also *Russell*, 473 U. S., at 147; *Mertens*, 508 U. S., at 263–264. Thus, we should expect that where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be "appropriate." Cf. *Russell, supra*, at 144.

But that is not the case here. The plaintiffs in this case could not proceed under the *first* subsection because they were no longer members of the Massey-Ferguson plan and, therefore, had no "benefits due [them] under the terms of [the] plan." § 502(a)(1)(B). They could not proceed under the *second* subsection because that provision, tied to § 409, does not provide a remedy for individual beneficiaries. *Russell, supra*, at 144. They must rely on the *third* subsection or they have no remedy at all. We are not aware of any ERISA-related purpose that denial of a remedy would serve. Rather, we believe that granting a remedy is consistent with the literal language of the statute, the Act's purposes, and pre-existing trust law.

For these reasons, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE THOMAS, with whom JUSTICE O'CONNOR and JUSTICE SCALIA join, dissenting.

In *Massachusetts Mut. Life Ins. Co.* v. *Russell*, 473 U. S. 134 (1985), we held that actions for fiduciary breach under §§ 409 and 502(a)(2), 29 U. S. C. §§ 1109, 1132(a)(2) (1988 ed.), the provisions of the Employee Retirement Income Security Act of 1974 (ERISA or Act) specifically designed for civil enforcement of fiduciary duties, must "be brought in a representative capacity on behalf of the plan as a whole." 473 U. S., at 142, n. 9. The Court today holds that § 502(a)(3), 29 U. S. C. § 1132(a)(3), the catchall remedial provision that directly follows § 502(a)(2), provides the individual relief for fiduciary breach that we found to be unavailable under § 502(a)(2). This holding cannot be squared with the text or structure of ERISA, and to reach it requires the repudiation of much of our reasoning in *Russell*. The Court also finds that Varity was subject to fiduciary obligations under ERISA because it engaged in activity of a "plan-related nature" that plan participants reasonably perceived to be conducted in the employer's capacity as plan fiduciary. *Ante*, at 503. This holding, like the first, has no basis in statutory text. Because these holdings are fundamentally at odds with the statutory scheme enacted by Congress, I respectfully dissent.

I

A

"ERISA is, we have observed, a 'comprehensive and reticulated statute,' the product of a decade of congressional study of the Nation's private employee benefit system." *Mertens* v. *Hewitt Associates*, 508 U. S. 248, 251 (1993) (quoting *Nachman Corp.* v. *Pension Benefit Guaranty Corporation*, 446 U. S. 359, 361 (1980)). The Act is "an enormously complex and detailed statute that resolved innumerable disputes between powerful competing interests—not all in

favor of potential plaintiffs." 508 U. S., at 262. Given the "evident care" with which ERISA was crafted, we have traditionally been "reluctant to tamper with [the] enforcement scheme" embodied in the statute. *Russell, supra,* at 147. Accordingly, we have repeatedly declined invitations by plan participants and beneficiaries to extend benefits and remedies not specifically authorized by the statutory text. See, *e. g., Mertens, supra,* at 262 (rejecting claim that ERISA affords a cause of action against a nonfiduciary who knowingly participates in a fiduciary breach); *Russell, supra,* at 145–148 (declining invitation to create an implied private cause of action for extracontractual damages); *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S. 41, 56 (1987) (holding that civil enforcement scheme codified at §502(a) is not to be supplemented by state-law remedies).

Nowhere is the care with which ERISA was crafted more evident than in the Act's mechanism for the enforcement of fiduciary duties. Part 4 of the Act's regulatory provisions, entitled "Fiduciary Responsibility," see §§ 401–414, 29 U. S. C. §§ 1101–1114, assigns fiduciaries "a number of detailed duties and responsibilities." *Mertens, supra,* at 251. Part 4 also includes its own liability provision, § 409, which we considered in *Russell.* Entitled "Liability for Breach of Fiduciary Duty," § 409 provides:

> "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." § 409(a), as codified in 29 U. S. C. § 1109(a) (1988 ed.).

Section 409, however, only creates liability. In order to enforce the right and obtain the remedy created by § 409, a plaintiff must bring suit under § 502(a)(2), one of ERISA's "carefully integrated civil enforcement provisions." *Russell, supra*, at 146. That section allows plan participants, beneficiaries, and fiduciaries, as well as the Secretary of Labor, to bring a "civil action . . . for appropriate relief" under § 409. Of the nine enforcement provisions currently codified at § 502(a), § 502(a)(2) is the only one that specifically authorizes suit for breach of fiduciary duty.

The plaintiffs in this case chose not to proceed through this carefully constructed framework, designed specifically to provide a cause of action for claims of fiduciary breach. Instead, the plaintiffs brought their claims for breach of fiduciary duty under § 502(a)(3) of the Act, which they claim provides an alternative basis for relief. Section 502(a)(3), as codified in 29 U. S. C. § 1132(a)(3) (1988 ed.), is a catchall remedial provision that authorizes a civil action

> "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

Since respondents are seeking equitable relief to redress a claimed violation of § 404, which is a provision in the same subchapter as § 502(a)(3), and since § 502(a)(3) authorizes recovery for breach of *any* provision in that subchapter, respondents contend that their claim of breach of fiduciary duty is cognizable under the plain language of § 502(a)(3). Respondents have a plausible textual argument, if § 502(a)(3) is read without reference to its surrounding provisions or our precedents.

Respondents' decision to proceed under § 502(a)(3)'s catchall provision instead of under §§ 409 and 502(a)(2) was obvi-

ously motivated by our decision in *Russell*. We held in *Russell* that § 409 authorizes recovery only by "the plan as an entity," 473 U. S., at 140, and does not allow for recovery by individual plan participants. *Id.*, at 139–144; see also *id.*, at 144 ("Congress did not intend that section to authorize any relief except for the plan itself"). The respondents, however, do not seek relief on behalf of the plan; rather they wish to recover individually. We reserved the question whether relief might be available for individuals under § 502(a)(3) in *Russell, id.*, at 139, n. 5, and respondents rightly understood this provision to offer the only possible route for securing their desired relief.

We would have to read § 502(a)(3) in a vacuum, however, to find in respondents' favor. Congress went to great lengths to enumerate ERISA's fiduciary obligations and duties, see §§ 401–408; §§ 410–412, to create liability for breach of those obligations, see § 409, and to authorize a civil suit to enforce those provisions, see § 502(a)(2). Section 502(a)(3), in contrast, is a generally worded provision that fails even to mention fiduciary duty. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374, 384 (1992) (citing *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.*, 482 U. S. 437, 445 (1987)). "[T]he law is settled that '[h]owever inclusive may be the general language of a statute, it "will not be held to apply to a matter specifically dealt with in another part of the same enactment."'" *Fourco Glass Co.* v. *Transmirra Products Corp.*, 353 U. S. 222, 228 (1957) (citations omitted). This is particularly true where, as here, Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions. See *HCSC-Laundry* v. *United States*, 450 U. S. 1, 6 (1981) *(per curiam)* (This "basic principle of statutory construction" applies "particularly when the two [provisions] are interrelated and closely positioned, both in fact being parts of" the same

statutory scheme). Applying this basic rule of statutory construction, I conclude that Congress intended §§ 409 and 502(a)(2) to provide the exclusive mechanism for bringing claims of breach of fiduciary duty.[1]

If Congress had intended to allow individual plan participants to secure equitable relief for fiduciary breaches, I presume it would have made that clear in §§ 409 and 502(a)(2), the provisions specifically enacted to address breach of fiduciary duty. See *Russell*, 473 U. S., at 144 (rejecting claim for extracontractual damages for failure timely to provide benefits in part because "the statutory provision explicitly authorizing a beneficiary to bring an action to enforce his rights under the plan—§ 502(a)(1)(B)—says nothing about the recovery of extracontractual damages") (citation omitted). In fact, Congress did provide for equitable relief in § 409, which authorizes "such other equitable or remedial relief as the court may deem appropriate" to redress a breach of fiduciary duty, but it only allowed such relief to be recovered by the plan. Congress did not extend equitable relief to individual plan participants, and we reversed the Court of Appeals in *Russell* for holding that it did. See *id.*, at 140. Thus, to accept the majority's position, I would have to conclude not only that Congress forgot to provide for individual relief in §§ 409 and 502(a)(2), but that it clearly intended to provide for individual relief in § 502(a)(3), a catchall provision that fails even to mention fiduciary breach and uses language identical to that in § 409, which we have already held authorizes equitable relief only on behalf of the plan. Compare

---

[1] On other occasions we have recognized that "[r]edundancies across statutes are not unusual events in drafting," and that where statutes overlap, courts should give effect to both absent a " 'positive repugnancy' " between them. *Connecticut Nat. Bank* v. *Germain*, 503 U. S. 249, 253 (1992) (quoting *Wood* v. *United States*, 16 Pet. 342, 363 (1842)). But *Germain* and similar cases involved claims of implied repeal, which we have long held should not be recognized unless two statutes irreconcilably conflict. *Germain* did not involve simultaneously enacted, consecutive provisions of the same Act, as in this case.

§ 409 (authorizing "such . . . equitable . . . relief as the court may deem appropriate") with § 502(a)(3) (authorizing "appropriate equitable relief"). While I would disagree with the majority's strained statutory interpretation in any case, "[t]he assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a 'comprehensive and reticulated statute.'" *Russell, supra,* at 146 (quoting *Nachman Corp.* v. *Pension Benefit Guaranty Corporation,* 446 U. S., at 361). See also *Mackey* v. *Lanier Collection Agency & Service, Inc.,* 486 U. S. 825, 837 (1988).[2]

The majority's reading of § 502(a)(3) also renders a portion of § 409 superfluous. If, as the Court today holds, § 502(a)(3) authorizes relief for breaches of fiduciary duty, then that section must authorize relief *on behalf of the plan* as well as on behalf of individuals. Nothing in § 502(a)(3) limits relief

---

[2] The majority apparently believes that § 502(a)(1)(B), 29 U. S. C. § 1132(a)(1)(B), "provides a remedy for breaches of fiduciary duty with respect to the interpretation of plan documents and the payment of claims." *Ante,* at 512 (citing *Russell,* 473 U. S., at 144). Since, in the majority's view, § 502(a)(1)(B) allows for individual recovery for fiduciary breach outside the framework created by §§ 409 and 502(a)(2), the majority wonders "[w]hy should we not conclude that Congress provided yet other remedies for yet other breaches of other sorts of fiduciary obligation in another, 'catchall' remedial section?" *Ante,* at 512.

The answer is simple. Contrary to the majority's understanding, § 502(a)(1)(B) does *not* create a cause of action for fiduciary breach, and *Russell* expressly rejected the claim that it does. Thus, the entire premise of the question is flawed. Section 502(a)(1)(B) deals exclusively with contractual rights under the plan. It allows a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." As we recognized in *Russell,* this provision "says nothing about the recovery of extracontractual damages." 473 U. S., at 144. If the justification for the Court's holding is that we should allow individual recovery for fiduciary breach under § 502(a)(3) since such recovery is available under § 502(a)(1)(B), then there really is no justification at all.

solely to individuals. And § 404(a), which the Court holds to be enforceable through § 502(a)(3), provides protection primarily, if not exclusively, for the plan. See *Russell, supra,* at 142–143, and n. 10. But if § 502(a)(3) allows plan participants to secure equitable relief on behalf of the plan, then § 409's promise of appropriate equitable relief for the plan is entirely redundant. Thus, the Court violates yet another well-settled rule of statutory construction, namely, that "courts should disfavor interpretations of statutes that render language superfluous." *Connecticut Nat. Bank* v. *Germain,* 503 U. S. 249, 253 (1992). Of course, this result could be avoided simply by reading the statute as written and by respecting the canon that specific enactments trump general ones in carefully constructed statutes like ERISA.

## B

This is not simply a case about the "specific governing the general," however. Nor is this a case solely about the interrelationship between §§ 409 and 502(a)(3). At every turn lies statutory proof, most of which the majority ignores, that Congress never intended to authorize individual plan participants to secure relief for fiduciary breach under ERISA. The majority also gives short shrift to our decision in *Russell.* See *ante,* at 509–510. It is only by overlooking the language and structure of ERISA and our reasoning in *Russell* that the majority is able to reach the conclusion that it does.

I begin with the Court's failure to address our reasoning and analysis in *Russell.* We held in *Russell* that under § 409, "actions for breach of fiduciary duty [must] be brought in a representative capacity on behalf of the plan as a whole." 473 U. S., at 142, n. 9. Because the holding in *Russell* applied only to §§ 409 and 502(a)(2), and because we reserved the question of individual relief under § 502(a)(3), see *id.,* at 139, n. 5, the majority concludes that "*Russell* does not control, either implicitly or explicitly, the outcome of the case before us." *Ante,* at 510.

*Russell* cannot be so easily dismissed. Our holding in that case was based not only on the text of § 409, but also on "the statutory provisions defining the duties of a fiduciary, and [on] the provisions defining the rights of a beneficiary." 473 U. S., at 140. The language of § 409 weighed heavily in our analysis, but it was ultimately "[a] fair contextual reading of the statute," *id.,* at 142, that led to our conclusion that "Congress did not intend that section to authorize any relief except for the plan itself." *Id.,* at 144. The majority is simply wrong when it states that the language "the Court found limiting" in *Russell* appears only in § 409. *Ante,* at 509. Since our holding in *Russell* relied on the language and structure of ERISA as a whole, and not solely on the text of §§ 409 and 502(a)(2), the Court cannot dismiss *Russell* on the ground that *Russell* provides no insight into the provisions at issue in this case.

Much of our reasoning in *Russell* forecloses the possibility of individual relief even under § 502(a)(3). For instance, in interpreting § 409 in *Russell* to afford relief solely on behalf of the plan, we found it significant that "the relevant fiduciary relationship characterized at the outset [of § 409 is] one 'with respect to a plan.'" 473 U. S., at 140. It must also be significant, then, that Congress employed the same or similar language virtually every time it referred to a fiduciary or a fiduciary obligation in ERISA. See, *e. g.,* §§ 3(21)(A), 404, 405, 406, 409, 411, 29 U. S. C. §§ 1002(21)(A), 1104, 1105, 1106, 1109, 1111. Section 404, the very provision that respondents seek to enforce in this case, governs the manner in which "a fiduciary . . . discharge[s] his duties *with respect to a plan.*" § 404(a)(1) (emphasis added). And the definition of a fiduciary under ERISA also places the focus on the responsibilities of a "fiduciary *with respect to a plan.*" § 3(21)(A) (emphasis added). In light of the "basic canon of statutory construction that identical terms within an Act bear the same meaning," *Estate of Cowart* v. *Nicklos Drilling Co.,* 505 U. S. 469, 479 (1992) (citation omitted), we should

accord Congress' repeated references to a "fiduciary with respect to a plan" the same significance we attributed to it in *Russell*, namely, that it reveals that ERISA's fiduciary obligations were designed to regulate the relationship between the fiduciary and the plan, and not the relationship between the fiduciary and individual participants.

Furthermore, "the emphasis on the relationship between the fiduciary and the plan as an entity" that we found to be "apparent" on the face of § 409, *Russell,* 473 U. S., at 140, pervades all of the fiduciary provisions in ERISA. This is to be expected, since the relief available under § 409 ultimately reflects the fiduciary duties and obligations that § 409 enforces. We recognized in *Russell* that, consistent with the wording of § 409, "the principal statutory duties imposed on the trustees relate to the proper management, administration, and investment of fund assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest." *Id.,* at 142–143. Though it is true that ERISA requires fiduciaries to discharge their "duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefits to participants and their beneficiaries," § 404(a)(1)(A)(i), it is equally true that the duties to which these commands apply deal primarily with obligations that relate to the plan, not individual plan participants. In fact, one of the two statutes we specifically cited in *Russell* as evidence that Congress was primarily concerned with the misuse of plan assets was § 404, the provision that respondents seek to enforce in this case. See 473 U. S., at 142–143, and n. 10.[3] That Congress was principally con-

---

[3] We also observed in *Russell* that the Act's legislative history, like its statutory provisions, "emphasize[s] the fiduciary's personal liability for losses *to the plan.*" 473 U. S., at 140, n. 8 (emphasis in original). We gleaned from the legislative history that "the crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future." *Id.,* at 141, n. 8.

cerned with "the financial integrity of the plan," *id.*, at 142, n. 9, is thus reflected not only in § 409, but throughout the fiduciary provisions § 409 enforces.[4]

Thus, though the majority finds *Russell* to be irrelevant, it is all but dispositive. We analyzed in that case all of the provisions the Court today holds to be enforceable through § 502(a)(3). We considered these provisions as part of our "contextual reading" of § 409, and only when we read § 409 in conjunction with these surrounding provisions did it become "abundantly clear that [§ 409's] draftsmen were primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan, rather than with the rights of an individual beneficiary." *Russell, supra,* at 142. This is not to say that Congress did not intend to protect plan participants from fiduciary breach; it surely did. Congress chose, however, to protect individuals by creating a single remedy on behalf of the plan rather than authorizing piecemeal suits for individual relief.

Given Congress' apparent intent to allow suit for breach of fiduciary duty exclusively under §§ 409 and 502(a)(2), and given the abundant evidence of Congress' intent to authorize only relief on behalf of the plan, I would hold that individual relief for fiduciary breach is unavailable under § 502(a)(3).

---

[4] The majority's citation of § 502(l), 29 U. S. C. § 1132(*l*) (1988 ed., Supp. I), in support of its interpretation of § 502(a)(3) is unpersuasive. Section 502(l) was enacted by Congress in 1989, more than a decade after ERISA was initially enacted. We have recognized that in interpreting ERISA, as with all statutes, "'the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.'" *Firestone Tire & Rubber Co.* v. *Bruch,* 489 U. S. 101, 114 (1989) (quoting *United States* v. *Price,* 361 U. S. 304, 313 (1960)). See also *Mackey* v. *Lanier Collection Agency & Service, Inc.,* 486 U. S. 825, 839–840 (1988). In any event, to the extent that § 502(l) indicates Congress' understanding (in 1989) that individual relief might be available for fiduciary breach, § 502(l) confirms that Congress did not believe that § 502(a)(3) affords such relief. That is the most reasonable inference from Congress' citation of §§ 502(a)(2) and (a)(5)—and, notably, not of § 502(a)(3)—in reference to statutes purportedly authorizing amounts to be paid to plan participants and beneficiaries.

## II

Even assuming that ERISA authorizes recovery for breach of fiduciary duty by individual plan participants, I cannot agree with the majority that Varity committed any breach of fiduciary duty cognizable under ERISA. Section 3(21)(A) of the Act explicitly defines the extent to which a person will be considered a fiduciary under ERISA. See 29 U. S. C. § 1002(21)(A). In place of the statutory language, the majority creates its own standard for determining fiduciary status. But constrained, as I am, to follow the command of the statute, I conclude that Varity's conduct is not actionable as a fiduciary breach under the Act.[5]

## A

Under ERISA, an employer is permitted to act both as plan sponsor and plan administrator. § 408(c)(3), 29 U. S. C. § 1108(c)(3) (1988 ed.). Employers who choose to administer their own plans assume responsibilities to both the company and the plan, and, accordingly, owe duties of loyalty and care to both entities. In permitting such arrangements, which ordinary trust law generally forbids due to the inherent potential for conflict of interest,[6] Congress understood that the

---

[5] As explained *supra*, at 524, the principal duties that ERISA imposes on plan fiduciaries involve the management of plan assets, the maintenance of records, disclosure of specified information, and avoidance of conflicts of interest. See *Massachusetts Mut. Life Ins. Co.* v. *Russell*, 473 U. S. 134, 142–143 (1985). Accordingly, we have recognized that "[f]iduciary status under ERISA generally attends the management of 'plan assets.'" *John Hancock Mut. Life Ins. Co.* v. *Harris Trust and Sav. Bank*, 510 U. S. 86, 89 (1993). However, since the Court holds that individual plan participants are entitled to recover for breach of fiduciary duty, I proceed here on·the assumption that fiduciary status can be predicated to some extent on interactions with individual plan participants.

[6] See *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 329–330 (1981) ("To deter the trustee from all temptation and to prevent any possible injury to the beneficiary, the rule against a trustee dividing his loyalties must be enforced with 'uncompromising rigidity.' A fiduciary cannot contend 'that,

interests of the plan might be sacrificed if an employer were forced to choose between the company and the plan. Hence, Congress imposed on plan administrators a duty of care that requires them to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." § 404(a)(1). Congress also understood, however, that virtually every business decision an employer makes can have an adverse impact on the plan, and that an employer would not be able to run a company profitably if every business decision had to be made in the best interests of plan participants.

In defining the term "fiduciary" in § 3(21)(A) of ERISA, Congress struck a balance that it believed would protect plan participants without impinging on the ability of employers to make business decisions. In recognition that ERISA allows trustee-beneficiary arrangements that the common law of trusts generally forbids, Congress "define[d] 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." *Mertens*, 508 U. S., at 262 (emphasis in original). Accordingly, under ERISA, a person "is a fiduciary with respect to a plan" only "to the extent" that "he has any discretionary authority or discretionary responsibility in the administration of such plan." § 3(21)(A)(iii), 29 U. S. C. § 1002(21)(A)(iii) (1988 ed.).[7] This

---

although he had conflicting interests, he served his masters equally well or that his primary loyalty was not weakened by the pull of his secondary one'") (citations omitted). See also G. Bogert & G. Bogert, Law of Trusts and Trustees §§ 121, 543 (rev. 2d ed. 1993).

[7] A person is also a "fiduciary with respect to a plan" under ERISA "to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, [or] (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so." § 3(21)(A), 29 U. S. C. § 1002(21)(A). In this case, the parties agree that Varity's status as a fiduciary turns on an interpretation of the statute's third category, which

"artificial definition of 'fiduciary,'" *Mertens, supra,* at 255, n. 5, is designed, in part, so that an employer that administers its own plan is not a fiduciary to the plan for all purposes and at all times, but only to the extent that it has discretionary authority to administer the plan. When the employer is not acting as plan administrator, it is not a fiduciary under the Act, and the fiduciary duty of care codified in § 404 is not activated.

Though we have recognized that Congress borrowed from the common law of trusts in enacting ERISA, *Firestone Tire & Rubber Co.* v. *Bruch,* 489 U. S. 101, 111 (1989), we must not forget that ERISA is a statute, and in " 'every case involving construction of a statute,'" the " 'starting point . . . is the language itself.'" *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 197 (1976) (citation omitted); see *Central Bank of Denver, N. A.* v. *First Interstate Bank of Denver, N. A.,* 511 U. S. 164, 173 (1994). We should be particularly careful to abide by the statutory text in this case, since, as explained, ERISA's statutory definition of a fiduciary departs from the common law in an important respect. The majority, however, tells us that the "starting point" in determining fiduciary status under ERISA is the common law of trusts. *Ante,* at 497. According to the majority, it is only "after" courts assess the common law that they may "go on" to consider the statutory definition, and even then the statutory inquiry is only "to ask whether, or to what extent, the language of the statute, its structure, or its purposes require departing from common-law trust requirements." *Ibid.* This is a novel approach to statutory construction, one that stands our traditional approach on its head.

To determine whether an employer acts as a fiduciary under ERISA, I begin with the text of § 3(21)(A)(iii). To "administer" a plan is to "manage or supervise the execution

relates to plan administration. See Brief for Petitioner 31; Brief for Respondents 33. See also Brief for United States as *Amicus Curiae* 25.

. . . or conduct of" the plan. Webster's Ninth New Collegiate Dictionary 57 (1991). See also Webster's New International Dictionary 34 (2d ed. 1957) (same). Essentially, to administer the plan is to implement its provisions and to carry out plan duties imposed by the Act. The question in this case is whether Varity was carrying out discretionary responsibilities over management or implementation of the plan, when, as respondents argued below, it "made misrepresentations to the class plaintiffs about MCC's business prospects and about the anticipated effect of the employment transfers on plaintiffs' benefits." Brief for Plaintiffs-Appellees in No. 93–2056 (CA8), p. 27. Although representations of this sort may well affect plan participants' assessment of the security of their benefits, I disagree with the majority that such communications qualify as "plan administration" under the Act.

In the course of running a business, an employer that administers its own benefits plan will make countless business decisions that affect the plan. Congress made clear in § 3(21)(A), however, that "'ERISA does not require that "day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants."'" *Adams* v. *Avondale Industries, Inc.*, 905 F. 2d 943, 947 (CA6) (citation omitted), cert. denied, 498 U. S. 984 (1990). Thus, ordinary business decisions, such as whether to pay a dividend or to incur debt, may be made without fear of liability for breach of fiduciary duty under ERISA, even though they may turn out to have negative consequences for plan participants. Even business decisions that directly affect the plan and plan participants, such as the decision to modify or terminate welfare benefits, are not governed by ERISA's fiduciary obligations because they do not involve discretionary administration of the plan. See *Curtiss-Wright Corp.* v. *Schoonejongen*, 514 U. S. 73, 78 (1995) (par-

enthetically quoting *Adams, supra,* at 947, for the proposition that "'a company does not act in a fiduciary capacity when deciding to amend or terminate a welfare benefits plan'"). In contrast, the discretionary interpretation of a plan term, or the discretionary determination that the plan does not authorize a certain type of procedure, would likely qualify as plan administration by a fiduciary. There is no claim in this case, however, that Varity failed to implement the plan according to its terms, since respondents actually received all of the benefits to which they were entitled under the plan, as the courts below found.

An employer will also make countless representations in the course of managing a business about the current and expected financial condition of the corporation.[8] Similarly, an employer may make representations that either directly or impliedly evince an intention to increase, decrease, or maintain employee welfare benefits. Like the decision to terminate or modify welfare benefits, the decision to make, or not to make, such representations is made in the employer's "corporate nonfiduciary capacity as plan sponsor or settlor," *Borst* v. *Chevron Corp.,* 36 F. 3d 1308, 1323, n. 28 (CA5 1994), cert. denied, 514 U. S. 1066 (1995), and ERISA's fiduciary rules do not apply. Such communications simply are not made in the course of implementing the plan or executing its terms. Rather, they are the necessary incidents of conducting a business, and Congress determined that employers

---

[8] The statements Varity made in this case are typical of the kind of statements management often makes in assessing the expected financial health of the company. See App. 80 ("I believe that with the continued help and support of you we can make Massey Combines Corporation the kind of successful business enterprise which we all want to work for"); *ibid.* ("[D]espite the depression which persists in the North American economy, I am excited about the future of Massey Combines Corporation"); *id.,* at 82 ("We are all very optimistic that our new company, has a bright future, and are excited by the new challenges facing all of us").

would not be burdened with fiduciary obligations to the plan when engaging in such conduct. See § 3(21)(A)(iii).[9]

To be sure, ERISA does impose a "comprehensive set of 'reporting and disclosure' requirements," which is part of "an elaborate scheme . . . for enabling beneficiaries to learn their rights and obligations at any time." *Curtiss-Wright Corp.* v. *Schoonejongen, supra,* at 83; see §§ 101–111, 29 U. S. C. §§ 1021–1031.[10] But no provision of ERISA requires an employer to keep plan participants abreast of the plan sponsor's

[9] Applying ERISA's fiduciary obligations to these types of communications will distort corporate decisionmaking in a way never intended by Congress. For instance, as petitioner observes, an employer contemplating the purchase of a competitor or the downsizing of a division "would be required, in order to avoid liability under ERISA, to fully describe [to its employees] its plans to do so because such plans might affect the 'security' of welfare benefits." Reply Brief for Petitioner 16, n. 20. Even if the Court's holding is not extended to cover the nondisclosure of information that might affect employee benefits, a simple inquiry by an employee into the possible effect of a business decision on plan benefits would be sufficient to saddle the employer with fiduciary obligations in conducting the proposed business transaction.

[10] For instance, the benefits plan must be established pursuant to a written instrument. § 402(a)(1), 29 U. S. C. § 1102(a)(1). Plan administrators must also furnish to participants a summary plan description, § 101(a), 29 U. S. C. § 1021(a), which "shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." § 102(a)(1), 29 U. S. C. § 1022(a)(1). The summary plan description must describe, among other things, the plan's requirements governing eligibility for participation and benefits as well as the procedures for presenting claims for benefits. § 102(b), 29 U. S. C. § 1022(b). Material modifications must be disclosed and must also be "written in a manner calculated to be understood by the average plan participant." § 102(a)(1). Plan administrators are also required to disclose specified financial information in annual reports filed with the Secretary of Labor and made available to participants upon request. §§ 103(b), 104(b), 29 U. S. C. §§ 1023(b), 1024(b). ERISA also dictates the times at which such disclosures must be made. § 104(b)(1).

financial security or of the sponsor's future intentions with regard to terminating or reducing the level of benefits.[11] And to the extent that ERISA does impose disclosure obligations, the Act already provides for civil liability and penalties for disclosure violations wholly apart from ERISA's provisions governing fiduciary duties. See §§ 502(a)(1)(A), 502(c). Though "[t]his may not be a foolproof informational scheme, . . . it is quite thorough." *Curtiss-Wright Corp., supra,* at 84. Congress' decision not to include the types of representations at issue in this case within the Act's extensive disclosure requirements is strong evidence that Congress did not consider such statements to qualify as "plan administration."[12]

---

[11] To the contrary, "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." *Curtiss-Wright Corp.* v. *Schoonejongen,* 514 U. S. 73, 78 (1995). As we made clear last Term, "ERISA does not create any substantive entitlement to employer-provided health benefits or any other kind of welfare benefits," nor does it "establish any minimum participation, vesting, or funding requirements for welfare plans as it does for pension plans." *Ibid.*

[12] Nor is the communication of information about the company's well-being or the possible effect of a business transaction on plan benefits considered plan administration under the Massey-Ferguson plan at issue in this case. The plan, the terms of which the majority fails to address, contains only two provisions that either require or authorize plan administrators to communicate plan information to plan participants. The first is contained in § 8.1.3, and it requires the plan administrator to make all disclosures required by ERISA. See App. 19 (requiring plan administrator to file required reports with the appropriate governmental agencies and to "comply with requirements of law for disclosure of Plan provisions and other information relating to the Plan to Employees and other interested parties"). The second, entitled *"Communication to Employees,"* is contained in § 10 of the plan. That section requires the company, "[i]n accordance with the requirements of the Act, [to] communicate the principal terms of the Plan to the Employees" and to "make available for inspection, by Employees and their beneficiaries, during reasonable hours at the principal office of the Company and at such other places as may be required by the Act, a copy of the Plan, the Trust Agreement, and of such other documents as may be required by the Act." *Id.,* at 21. The only other responsibility the plan expressly delegates to the plan administrator

Because an employer's representations about the company's financial prospects or about the possible impact of ordinary business transactions on the security of unvested welfare benefits do not involve execution or implementation of duties imposed by the plan or the Act, and because these are the types of representations employers regularly make in the ordinary course of running a business, I would not hold that such communications involve plan administration. The untruthfulness of a statement cannot magically transform it from a nonfiduciary representation into a fiduciary one; the determinative factor is not truthfulness but the capacity in which the statement is made.

## B

With only passing reference to the relevant statutory text, the majority discards the limits that Congress imposed on fiduciary status and replaces them with a far broader standard plucked from the common law of trusts. See *ante*, at 502. Relying on trust treatises and our decision in *Central States, Southeast & Southwest Areas Pension Fund* v. *Central Transport, Inc.*, 472 U. S. 559 (1985), the majority concludes that a person engages in plan administration whenever he exercises " 'powers as are necessary or appropriate for the carrying out of the purposes' of the trust." *Ante*, at

is the administration of claims pursuant to the plan's claims procedure, which is described in § 11 of the plan. See generally *id.*, at 18–20 (section of plan entitled *"Allocation of Responsibilities Among Named Fiduciaries,"* which enumerates all of the fiduciary obligations imposed by the plan).

Though I do not claim that plan administration is necessarily limited to performance of duties imposed by the plan documents, see *ante*, at 504, the majority's response to this straw man argument—that ERISA's fiduciary obligations would be meaningless if only the performance of duties imposed by the plan qualified as plan administration—is nonetheless flawed. The majority's argument is based on the mistaken assumption that a plan cannot assign discretionary authority to plan administrators (the exercise of which would clearly be subject to fiduciary duties under the Act), an assumption flatly contradicted both by the common law of trusts and by common sense. See Bogert & Bogert, *supra* n. 6, § 552.

502 (quoting 3 A. Scott & W. Fratcher, Law of Trusts § 186, p. 6 (4th ed. 1988)).[13]

The majority's approach is flawed in at least two respects. First, the standard that it borrows from the common law of trusts is not the common-law standard for determining whether a person is a fiduciary. Rather, it is the standard the common law uses to define the scope of a fiduciary's authority once it is settled that a person is a fiduciary. Thus, the Court inexplicably takes a common-law standard that presumes that a person is a fiduciary and applies it to determine whether, under the statute, that person is a fiduciary in the first place. The majority's approach ignores the patent differences between the definition of a fiduciary under ERISA and the common law, and in the process expands the activities that are governed by fiduciary standards beyond those designated by the statutory text.[14]

---

[13] Also, the majority twice looks to § 404(a) in attempting to determine the scope of fiduciary status under ERISA. See ante, at 502, 511. Specifically, the majority relies on § 404(a)(1)(D), which requires a fiduciary to discharge his duties "in accordance with the documents and instruments governing the plan." But § 404(a)(1)(D) does not determine whether a person is acting as a fiduciary. Like the other provisions of § 404, it merely establishes a ground rule for functions performed by a person deemed to be a fiduciary under § 3(21)(A). The majority cannot rely on § 404(a)(1)(D) to determine whether a person has assumed fiduciary status, since that provision applies only after it has been established that a person is a fiduciary.

[14] The majority's reliance on Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc., 472 U. S. 559 (1985) (cited ante, at 502), illustrates the flaw in the majority's approach. Although we quoted there the same passage from the Scott treatise that the majority substitutes for the text of § 3(21)(A), see Central States, supra, at 570, the Court was not attempting to determine in that case, as we are here, whether a person was acting as a fiduciary with respect to a plan under § 3(21)(A). There was no question that the trustee in Central States was a fiduciary under § 3(21)(A), and there was no question that the audit the trustees wished to perform was a fiduciary function. The only question in Central States was whether the plan trustees, who were admittedly

Second, the majority disregards any possible distinction between the respective roles of an ERISA trustee and an ERISA plan administrator that might counsel against the wholesale importation, into the statutory definition of plan administration, of common-law rules governing trustees. Under ERISA, a plan trustee is charged with "exclusive authority and discretion to manage and control the assets of the plan." §403, 29 U. S. C. §1103. Because the trustee's authority over plan assets is exclusive, a plan administrator under ERISA lacks the pre-eminent responsibility of the common-law trustee, namely, the management of the trust corpus. Thus, while it may be true under the common law that a trustee has such powers as are necessary to further the purposes of the trust, it does not automatically follow that the administrator of a benefits plan (who by definition lacks authority over plan assets) possesses all authority "necessary or appropriate" for carrying out the purposes of the plan. And the majority cites no authority for its assumption that an ERISA plan administrator is the functional equivalent of a common-law trustee. See *ante*, at 502, 505, 506.

At bottom, the majority's analysis is an exercise in question begging. If speculating about the company's financial stability or the security of plan benefits does not involve discretionary authority in plan administration, it is wholly irrelevant that providing such information "would seem" to be related to "carrying out an important plan purpose." *Ante*, at 502. That a communication was "about benefits," *ante*, at 501, or an activity was of a "plan-related nature," *ante*, at 503, is also of little significance unless the act involved plan administration. The whole purpose of §3(21)(A)(iii) is to

---

fiduciaries, were authorized by the plan to perform this concededly fiduciary function. Like the common-law principle cited therein, the *Central States* dicta only becomes relevant once it is settled that a person is a fiduciary.

make clear that one who engages even in benefit-related or plan-related conduct is a fiduciary only "to the extent" he has discretionary authority to administer the plan. See *John Hancock Mut. Life Ins. Co.* v. *Harris Trust and Sav. Bank*, 510 U. S. 86, 104–105 (1993) (Congress uses the phrase "to the extent" to make clear that "to *some* extent" actions that would otherwise be included in a general category were meant to be excluded). The majority's end run around this important limitation by reference to inapplicable principles from the common law of trusts is unpersuasive.

The majority confirms that the statutory text is largely irrelevant under its approach by indulging the notion that a plan participant's subjective understanding of the employers' conduct is relevant in determining whether an employer's actions qualify as "plan administration" under ERISA. The majority concludes that Varity was engaged in plan administration in part on the ground that "reasonable employees . . . could have thought" that Varity was administering the plan. *Ante*, at 503. ERISA does not make a person a fiduciary to the extent reasonable employees believe him to be a fiduciary, but rather to the extent "he has any discretionary authority or discretionary responsibility in the administration of such plan." § 3(21)(A)(iii). Under ERISA, an act either involves plan administration, or it does not; whether the employees have a subjective belief that the employer is acting as a fiduciary cannot matter. A rule turning on the subjective perceptions of plan participants is simply inconsistent with ERISA's fundamental structure, which is built not upon perceptions, but "around reliance on the face of written plan documents." *Curtiss-Wright Corp.*, 514 U. S., at 83.[15]

---

[15] As petitioner observed: "It is difficult to imagine a situation involving *any* communication in any 'context' as to future business decisions that might affect a participant's benefit choices that could not 'reasonably' be viewed by employees as an act of a plan administrator, especially when employees directly ask about such intentions." Reply Brief for Petitioner 18 (emphasis in original).

## C

Finally, the majority's conclusion that a fiduciary duty was breached is based upon an inaccurate assessment of the record in this case. It is true that Varity expressed falsely optimistic forecasts about its new venture's prospects for success in an effort to entice employees to transfer to the new company. But the majority, I believe, tells only part of the story when it states that "the basic message conveyed to the employees was that transferring from Massey-Ferguson to Massey Combines would not significantly undermine the security of their benefits." *Ante*, at 501. As I read the record, the message Varity conveyed was that the security of jobs and benefits would be contingent upon the success of the new company. Varity repeatedly informed its employees that "[e]mployment conditions in the future will depend on our ability to make Massey Combines Corporation a success and *if changes are considered necessary or appropriate, they will be made*." App. 76 (emphasis added).[16] The majority also fails to note that the plan documents expressly reserved to Varity the right "[t]o Terminate, Suspend, Withdraw, Amend or Modify the Plan in Whole or in Part." *Id.*,

---

[16] See also App. 80 (transcript of videotape message to employees) ("When you transfer your employment to the Massey Combines Corporation, pay levels and benefit programs will remain unchanged. . . . Employment conditions in the future will depend on the success of the Massey Combines Corporation and should changes be deemed appropriate or necessary, they will be made"); *id.*, at 82 (cover letter to employees) ("When you accept employment with Massey Combines Corporation, pay levels and benefit programs will remain unchanged. . . . Employment conditions in the future will depend on our ability to make Massey Combines Corporation a success, and if changes are considered necessary or appropriate, they will be made").

When read in light of the District Court's finding that the combines industry had been in a state of "unprecedented decline [for the four years prior to the creation of MCC] . . . caused in significant part by an extreme depression in this country's agricultural economy," App. to Pet. for Cert. 53a, the company's qualifications take on even greater significance.

at 43. The Court thus holds today that an employer breaches a fiduciary obligation to participants in an ERISA plan when it makes optimistic statements about the company's financial condition and thereby implies that unvested welfare benefits will be secure, even though the employer simultaneously informs plan participants that changes will be made if economic conditions so require and the plan documents expressly authorize the employer to terminate the unvested welfare benefits at any time. I cannot agree with this result.

## III

I do not read the Court's opinion to extend fiduciary liability to all instances in which the Court's rationale would logically apply. Indeed, the Court's awkward articulation of its holding confirms that this case is quite limited. See *ante,* at 503 ("We conclude . . . that the factual context in which the statements were made, combined with the plan-related nature of the activity, engaged in by those who had plan-related authority to do so, together provide sufficient support for the District Court's legal conclusion that Varity was acting as a fiduciary"); *ante,* at 505 ("[W]e hold that making intentional representations about the future of plan benefits *in that context* is an act of plan administration") (emphasis added).

If not limited to cases involving facts similar to those presented in this case, the Court's expansion of recovery for fiduciary breach to individuals and its substantial broadening of the definition of fiduciary will undermine the careful balance Congress struck in enacting ERISA. See *Pilot Life Ins. Co.* v. *Dedeaux,* 481 U. S., at 54 (ERISA's "civil enforcement scheme . . . represents a careful balancing of the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans"); *Mertens,* 508 U. S., at 262–263. Although Congress sought to guarantee that employees receive the welfare benefits promised by employers, Congress was also

aware that if the cost of providing welfare benefits rose too high, employers would not provide them at all.   See *Russell*, 473 U. S., at 148, n. 17 (warning against expanding liability beyond that intended by Congress, "lest the cost of federal standards discourage the growth of private pension plans") (citation omitted); *Hozier* v. *Midwest Fasteners, Inc.*, 908 F. 2d 1155, 1170 (CA3 1990) (recognizing "Congress's judgment that employees themselves are best served by an enforcement regime that minimizes employers' expected liability for reporting and disclosure violations—and with it, the disincentives against creating employee benefit plans in the first place").[17]   Application of the Court's holding in the many cases in which it may logically apply could result in significantly increased liability, or at the very least heightened litigation costs, and an eventual reduction in plan benefits to accommodate those costs.   Fortunately, the import of the Court's holdings appears to be far more modest, and courts should not feel compelled to bind employers to the strict fiduciary standards of ERISA just because an ordinary business decision turns out to have an adverse impact on the plan.

I respectfully dissent.

---

[17] That is presumably why Congress exempted welfare benefits from the stringent, and costly, vesting requirements imposed on pension benefits. See *Curtiss-Wright Corp.*, 514 U. S., at 78.