**J. Ronald PENGILLY, Plaintiff,**

v.

**The GUARDIAN LIFE INSURANCE COMPANY OF AMERICA, Defendant.**

**No. C 98–1765 SBA.**

United States District Court, N.D. California.

Jan. 6, 2000.

 

Richard H. Rosenthal, Law Offices of Richard H. Rosenthal PC, Carmel, CA, for plaintiff.

Mary L. Guilfoyle, Epstein Becker & Green, San Francisco, CA, for defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS IN PART AND FOR PARTIAL SUMMARY JUDGMENT and DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

ARMSTRONG, District Judge.

This matter now comes before the Court on Defendant's Motion to Dismiss in part and for Partial Summary Judgment and on Plaintiff's Motion for Partial Summary Judgment. Having read and considered all the papers submitted by the parties, and being fully informed, the Court hereby GRANTS Defendant's Motion to Dismiss in part and for Partial Summary Judgment and DENIES Plaintiff's Motion for Partial Summary Judgment.

## I. BACKGROUND

Plaintiff J. Ronald Pengilly worked as a lawyer for Pettit & Martin for 38 years. Pettit & Martin provided long term disability benefits to its employees through a long-term disability plan (LTD) it purchased from the defendant, The Guardian Life Insurance Company of America. Under this LTD, an eligible employee with a long term disability receives a monthly payment equal to 66 2/3% of his "prior monthly earnings." The maximum monthly benefit is $22,000.00. (Selden Decl. in Support of Pl.'s Mot for Partial Summ. J., Ex. 1 at p. 4). "Monthly earnings" means "an employee's rate of monthly earnings. Bonuses, commissions, expense accounts, overtime pay and any other extra compensation are excluded." (Selden Decl. in Support of Pl.'s Mot for Partial Summ. J., Ex. 1 at p. 5). More generally, "prior monthly earnings" means "an employee's rate of monthly earnings **right before** his total disability starts." (Selden Decl. in Support of Pl.'s Mot for Partial Summ. J., Ex. 1 at 21) (emphasis added).

Guardian's plan limits the time period during which an employee qualifying for the long term disability payments is entitled to benefits. For an individual, such as plaintiff in the instant case, who is 60 years old when his disability starts, the maximum payment period is 5 years. (Selden Decl. in Support of Pl.'s Mot for Partial Summ. J., Ex. 1 at p. 5). Moreover, if such an individual is disabled by a *"mental* or emotional condition," Guardian's payments cease at the end of two years of payments. (Selden Decl. in Support of Pl.'s Mot for Partial Summ. J., Ex. 1 at p. 27) (emphasis added).

### 1. Prior Monthly Earnings

On April 21, 1995, plaintiff applied for a long term disability payment from Guardian. (Sigman Decl. in Support of Def.'s Motion to Dismiss and for Partial Summary Judgment, Ex. A at 1). In a form accompanying this application, Dr. Ellen Haller listed "severe depression" as plaintiff's disability and asserted that his disability had rendered him unable to work beginning on April 13, 1995. (Sigman Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J., Ex. A at 1). In a letter dated June 28, 1995, Guardian

informed plaintiff that it had approved his application and that his benefits would commence effective July 13, 1995. (Sigman Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J., Ex. B at 1).

On his application, plaintiff listed $118,-150.00 as his "average earnings excluding bonus, overtime, and special compensation." (Sigman Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J., Ex. A at 2). Guardian divided this figure by twelve and arrived at $9,845.83 as plaintiff's monthly earnings. It then multiplied these earnings by 66 2/3% to arrive at $6,564.00 as plaintiff's gross monthly benefit amount. (Sigman Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J. at ¶ 13). After deducting plaintiff's monthly worker compensation benefits, Guardian determined that plaintiff was entitled to a net payment of $4,437.10. (Sigman Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J. at ¶ 15).

By a letter dated August 31, 1995, Stan Weiland, on behalf of Mr. Pengilly, requested that Guardian review its computation of plaintiff's monthly payment. He explained that plaintiff had received $51,-385.61 in pay in the 1995 calendar year up until his last day of work on April 12, 1995. Therefore, he stated that plaintiff's monthly gross payment should have been $17,-128.53, which would translate into a net monthly payment of $11,424.72.

Per plaintiff's request, Guardian recalculated plaintiff's monthly payment. Instead of using the $118,150.00 figure from plaintiff's application for computing plaintiff's prior monthly earnings, defendant used an even higher figure, $139,633.00, which was the amount of yearly earnings that Pettit & Martin listed for plaintiff when it applied for benefits on his behalf. (Sigman Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J. at ¶¶ 12 and

19). After conducting this calculation, defendant determined that plaintiff was entitled to a net monthly benefit of $5,998.67. Guardian reimbursed plaintiff for the prior underpayments. (Sigman Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J. at ¶¶ 19–20).

That decision did not end the controversy. On November 6, 1996, Guardian terminated plaintiff's payments after learning that plaintiff had retired from the partnership of Pettit & Martin on September 30, 1992, prior to the date that the LTD policy took effect. (Sigman Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J. at ¶ 24–25). Plaintiff promptly and timely appealed this decision in a November 22, 1996 letter. As a result of this appeal, Guardian quickly reversed its decision and, by way of a letter dated January 6, 1997, reinstated his benefits at his prior level of $5,998.67 a month. (Tyler Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J. at ¶ 2 and Ex. A).

Soon thereafter, plaintiff renewed his claim that Guardian was paying him an incorrect benefit amount. (Tyler Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J. at ¶ 3). After consulting a certified public accountant and reviewing plaintiff's claim, Guardian made a drastic change in its calculation of his predisability earnings. Whereas it previously had divided plaintiff's yearly income by twelve, it now determined that, consistent with Guardian's alleged standard practice, the proper method of calculation is to rely on the "claimant's earnings during the 30 days immediately preceding the date of disability." (Tyler Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J. at ¶ 6). Using this formula, Guardian determined that plaintiff had earned $15,327.59 in the thirty days preceding the onset of his disability, thus resulting in a net monthly benefit of $10,-129.00.[1] *Id.* at ¶ 11.

---

1. Guardian inadvertently transposed numbers in reaching this figure of $10,129.00. In fact, plaintiff's monthly benefit should have been $10,219.00. Guardian later discovered this error and issued a check to plaintiff to satisfy its underpayment.

On June 25, 1997, plaintiff's son sent a letter challenging this decision as well. Plaintiff's son, who is an attorney, contended that the calendar month of March 1995, rather than the 30 days prior to April 13, 1995, should be the proper calculation period for plaintiff's "prior monthly earnings." (Tyler Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J., Ex. C at 2). On that basis, he alleged that plaintiff earned $29,081.80 in the month prior to his disability. *Id.* In response to this further challenge from plaintiff, Guardian informed plaintiff in a July 24, 1997 letter that it had determined that its most recent calculation was correct. (Tyler Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ. J., Ex. E at 1).

### 2. Physical Illness or Mental Condition

As is evident from the discussion above, plaintiff communicated to Guardian a number of times his objections to Guardian's calculation of his benefits. In these communications, however, he did not once raise any objection as to Guardian's decision to treat his condition as a mental condition rather than a physical illness. He first raised this issue in a letter dated February 3, 1998.

As early as January of 1997, Guardian indicated to plaintiff that it deemed his condition to constitute a mental condition under the LTD. As already discussed, plaintiff, who was 60 years old when his disability commenced, was entitled to a maximum payment period of five years *unless* a mental or emotional condition disabled him in which case two years would serve as his maximum period. In the letter dated January 6, 1997, in which Guardian reversed its decision that plaintiff was not an eligible employee, Guardian informed plaintiff that his benefits would be exhausted on *July 12, 1997,* a mere *two* years after his benefits originated on July 13, 1995. (Tyler Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ.

J., Ex. A). Accordingly, plaintiff had notice at that early juncture that Guardian had classified his disability as a mental or emotional condition.

### 3. Plaintiff's First Amended Complaint

On May 1, 1998, plaintiff filed his original complaint in this matter. On October 1, 1998, Judge Breyer dismissed counts one through four. Plaintiff filed his first amended complaint on May 17, 1999. In it, he alleges three causes of action, which are designated respectively as his fifth, sixth, and seventh claims for relief. In his fifth claim for relief, plaintiff moves for declaratory relief that the term "monthly earnings," when applied to his claim, "refers to the calendar month of March, 1995." In his sixth claim for relief, plaintiff moves for the disability benefits that Guardian allegedly denied him by misinterpreting the meaning of "monthly earnings" and by arbitrarily classifying plaintiff's disability as caused by a mental rather than physical condition. Finally, in his seventh claim for relief, plaintiff alleges that Guardian breached its fiduciary duty by construing its disability benefits in a variety of ways to the detriment of employees.[2]

### 4. Motions Presently Before the Court

Both parties now bring motions before this Court. Plaintiff moves for Partial Summary Judgment on two accounts. First, he moves the Court to conclude that "Plaintiff's 'prior monthly earnings' should have been calculated based upon his earnings during March 1995, not March 13 to April 12, 1995, with a Gross Monthly Benefit in the amount of $29,051.80." (Pl.'s Mot. at 3). Second, he moves the Court to find that "Plaintiff's disability is caused by a physical or organic sickness and, therefore, plaintiff's LTD benefits should have been paid for five years, not two, so long

---

**2.** Plaintiff brings this action individually and on behalf of others similarly situated.

as he was totally disabled within the terms of the policy." (*Id.*).

Defendant moves the Court to dismiss in part and for partial summary judgment. Defendant also moves to strike Dr. Mark Levy's Declaration in Support of Plaintiff's Motion for Partial Summary Judgment.

## II. *STANDARD OF REVIEW*

Under Federal Rule of Civil Procedure 56, summary judgment is warranted against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party moving for summary judgment bears the initial burden of demonstrating the "absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. If the movant meets this burden, the nonmoving party must come forward with specific facts demonstrating a genuine factual issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. *DISCUSSION*

**A. Guardian's Calculation of Plaintiff's Benefits**

1.  **Standard of Review for Reviewing Denial of Benefits under an ERISA Plan**

■ Pursuant to 29 U.S.C. § 1132(a)(1)(B), an individual may bring a civil action to recover benefits due him from an ERISA plan. ERISA does not provide for the standard of review for an action brought under § 1132(a)(1)(B). *Firestone Tire and Rubber Co.*, 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80

(1989). The Supreme Court has established the standard: "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115, 109 S.Ct. 948. If the plan provides such discretion, then abuse of discretion is the applicable standard. *Id.; Friedrich v. Intel*, 181 F.3d 1105, 1109 (9th Cir.1999).

■ Even when a plan provides the discretionary authority envisioned by *Firestone*, however, a factor in determining whether there was an abuse of discretion is whether the fiduciary was operating under a conflict of interest. *Firestone*, 489 U.S. at 116-17, 109 S.Ct. at 957. The Ninth Circuit has interpreted this statement from *Firestone* as implicating a two step analysis. *See Atwood v. Newmont Gold Co., Inc.*, 45 F.3d 1317, 1322–23 (9th Cir.1995). First, the beneficiary must provide "material, probative evidence, beyond the mere fact of apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Friedrich*, 181 F.3d at 1109 (internal quotation omitted). In response to such evidence, the fiduciary or plan administrator must produce evidence showing that the conflict of interest did *not* impact the decision to deny benefits. *Id.* If the fiduciary fails to produce such evidence, then de novo is the applicable standard of review. *Id.*

a.  **In the Instant Case, Abuse of Discretion Is the Appropriate Standard Pursuant to the Plan's Grant of Discretion**

■ In the instant case, the first issue is whether Guardian's plan fits within the *Firestone* exception by giving the administrator or fiduciary "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Pursuant

to the terms of the plan, Guardian "is the Claims Fiduciary with discretionary authority to determine eligibility for benefits and to construe the terms of the plan with respect to claims." Except for adding the words "with respect to claims" and substituting "and" for "or," Guardian's language recites verbatim the language in *Firestone.* Nevertheless, plaintiff contends that Guardian's grant of discretion is ambiguous and therefore not meriting of the *Firestone* exception.

Plaintiff argues first that allowing the fiduciary "discretionary authority ... to construe" is ambiguous because it includes discretionary authority *not* to construe. (Pl.'s Mot. at 6). As a result, Guardian can frustrate ERISA's policy—providing fast relief to plan beneficiaries—merely by declining to construe the terms of the plan. Furthermore, plaintiff contends, the plan, by allowing Guardian to "construe the terms of the plan with respect to claims," permits Guardian to construe the plan in a specific case in a way that is contradictory to the otherwise plain meaning of the language.

Plaintiff relies on *Kearney v. Standard Ins. Co.,* 175 F.3d 1084 (9th Cir.1999), *cert. denied* —— U.S. ——, 120 S.Ct. 398, 145 L.Ed.2d 310 (1999), for its conclusion that the grant of discretion must be unambiguous in order to qualify for the *Firestone* exception. In that case, the court concluded that the following language did *not* constitute an unambiguous grant of discretion: "Subject to all the terms of the Group Policy, Standard will pay the LTD Benefit described ... upon receipt of satisfactory written proof that you have become disabled while insured under the Group Policy." *Kearney,* 175 F.3d at 1089. The court found that the term "satisfactory" was subject to at least two reasonable interpretations against the insurer and that the ambiguity should be interpreted in favor of the insured. *Id.* at 1090.

Unlike in *Kearney,* the language in the instant case is not ambiguous; rather, it is analogous to the plan language in *Taft v.*

*Equitable Life Assurance Soc'y,* 9 F.3d 1469 (9th Cir.1994). The plan at issue in that case granted Equitable the authority "to construe and interpret the Plan, decide questions of eligibility and determine the amount, manner and time of payment of any distributions." *Taft,* 9 F.3d at 1471 (internal quotations omitted). The Ninth Circuit determined that this language afforded the plan administrator discretionary authority. *Id.* Likewise, Guardian's plan extends to the fiduciary the discretion to construe the terms of the plan and to determine eligibility for benefits. Moreover, the language in Guardian's plan recites the language in *Firestone* that created the exception. Plaintiff's allegations of ambiguity more precisely are challenges on fairness grounds to the ability of the fiduciary to exercise discretion in construing the terms of the claim. *Firestone,* however, permits fiduciaries to exercise such discretion. The Court finds that Guardian's plan fits within the *Firestone* exception (subject to the conflict of interest analysis below).

██ In so finding, the Court notes that plaintiff's fear that Guardian can interpret the plan's terms in ways that contradict their plain meaning is overstated. As *Taft* observed, Ninth Circuit courts repeatedly have concluded that construing provisions of a plan in a manner that conflicts with the plan's plain language constitutes an abuse of discretion. *Id.* at 1472. Even under the traditional abuse of discretion standard, a defendant's interpretation of a claim term must be reasonable. *Firestone,* 489 U.S. at 116-17, 109 S.Ct. 948.

**b. Guardian's Alleged Conflict of Interest Does Not Necessitate De Novo Review**

██ Even though Guardian's plan qualifies for the *Firestone* exception to de novo review, the second issue is whether a conflict of interest still necessitates de novo review. The threshold issue is whether an apparent conflict exists. *See Friedrich,* 181 F.3d at 1109. If the same

party serves as plan administrator and funds the plan from its general assets, then an apparent conflict exists. *Id.* In the instant case, plaintiff claims that Guardian is the party responsible for paying the plan's benefits and for administering the claims. Therefore, plaintiff asserts that Guardian operates under a conflict of interest.

The facts do not necessarily reveal an apparent conflict. Defendant adduces undisputed evidence that, pursuant to a negotiated reinsurance agreement, the reinsurer, rather than Guardian, is responsible for paying any amount exceeding $5,000 monthly on an individual claim. (Tyler Decl. in Support of Def.'s Motion to Dismiss and for Partial Summ.J. at ¶ 11). Because all parties agree that plaintiff is entitled to at least $5,000 in monthly benefits, Guardian challenges plaintiff's assumption of an apparent conflict of interest. This evidence at least weakens if not undermines any conclusion that an apparent conflict exists.

■ If an apparent conflict exists, then plaintiff bears the initial burden of adducing material evidence tending to show that the fiduciary's self-interest caused it to breach his obligations to his beneficiary. *Friedrich,* 181 F.3d at 1109. In this case, plaintiff's only specific evidence that defendant breached its fiduciary duty as a result of its self-interest when it calculated plaintiff's monthly benefits is that defendant construed the ambiguous term, "prior monthly earnings," in its favor and then misrepresented this policy provision in two letters to plaintiff. (Pl.'s Opp'n to Def.'s Mot. to Dismiss In Part and for Partial Summ.J. at 8). As will be discussed at length below, defendant's construction of the term "prior monthly earnings" was reasonable and therefore does not tend to show that defendant's alleged self-interest impacted it. Although plaintiff is correct that defendant's two letters stated that monthly earnings means an employee's rate of monthly earnings on the *day* before his disability begins, which is more specific

than the policy language—"right before"—(Pl.'s Mot., Exs. 4 and 27), the relevance of this so-called misrepresentation is unclear. As will be discussed *infra,* defendant's construction of the term "monthly" probably benefitted plaintiff, which counsels against imputing any ill intent to defendant's substitution of "on the day before" for "right before." Moreover, "on the day before" is one of eight different definitions of "earnings" employed in Guardian policies. (Pl.'s Mot., Ex. 38 at D–01155).

In short, plaintiff has not adduced sufficient evidence that Guardian's conflicting interest caused it to breach its fiduciary obligations to plaintiff in calculating his benefits. The Court finds that abuse of discretion is the appropriate standard of review for defendant's calculation of plaintiff's benefits.

## 2. Guardian Did Not Abuse Its Discretion in Calculating Plaintiff's Prior Monthly Earnings

■ Both plaintiff and defendant move for summary judgment on issues pertaining to defendant's calculation of plaintiff's monthly benefits. Whereas plaintiff moves the Court to conclude that "Plaintiff's 'prior monthly earnings' should have been calculated based upon his earnings during March 1995, not March 13 to April 12, 1995, with a Gross Monthly Benefit in the amount of $29,051.80," (Pl.'s Mot. at 3), defendant moves the Court to find that plaintiff has failed to adduce facts sufficient for the Court to conclude that defendant's calculation of plaintiff's benefits was unreasonable. (Def.'s Mot at 1). As discussed above, the standard of review for this decision is abuse of discretion. Accordingly, the dispositive issue is whether Guardian's interpretation of the policy's terms and its denial of benefits were unreasonable. *See Winters v. Costco Wholesale Corp.,* 49 F.3d 550, 553 (9th Cir.1995). A plan administrator abuses its discretion if it provides no explanation for its decision, reaches a conclusion in conflict with the plan's plain language, or bases its deci-

sion on clearly erroneous findings of fact. *Atwood,* 45 F.3d at 1323–4.

In its final calculation, defendant determined that plaintiff's "prior monthly earnings" were $15,327.59. Plaintiff alleges that his "prior monthly earnings" were $29,051.80. The best starting point is to discern how the parties arrived at these figures. Plaintiff maintains that "prior monthly earnings" encompasses all earnings, receipts as well as accruals, in the calendar month of March 1995. Therefore, he includes March-dated checks of $4,343.49, $198.60, and $4,994.00 and various accruals of $1,479.48, $13,200, $3,256.51, and $1,579.62. Defendant contends that "prior monthly earnings" encompasses all earnings in the 30 day period preceding plaintiff's disability. It therefore counts the only two checks dated within that time frame: $4,994 and $10,333.59. The chart below summarizes these dueling calculations:

|  | Plaintiff's Calculation | Defendant's Calculation |
| --- | --- | --- |
| **Fixed Monthly Arrangement** | $1,479.58 | |
| **Check No. 153528 Dated March 10, 1995 (50% Plan)** | $4,343.49 | |
| **Check No. 153683 Dated March 10, 1995 (50% Plan)** | $198.60 | |
| **Check No. 153961 Dated March 24, 1995 (50% Plan)** | $4,994.00 | $4,994.00 |
| **Advances** | $13,200.00 (January and February Advances of $6,600 each) | |
| **Payment by Pettit to Investment Wood Island Associates** | $3,256.51 | |
| **Payment by Pettit for Insurance** | $1,579.62 | |
| **Check No. 154169 Dated April 7, 1995** | | $10,333.59 |
| **TOTAL** | $29.051.80 | $15,327.59 |

■ Three issues emerge. The first issue is whether "prior monthly earnings" refers to the 30 day period immediately preceding plaintiff's disability or instead to the calendar month preceding the calender month during which plaintiff's disability commenced. "Prior monthly earnings" means **"an employee's rate of monthly earnings right before his total disability starts."** (Selden Decl. in Support of Pl.'s Mot for Partial Summ.J., Ex. 1 at p. 21) (emphasis added). Plaintiff argues that this definition is ambiguous and that the best construction of it is that it refers to the earnings during the calendar month

right before the disability began. (Pl.'s Mot. at 8). Plaintiff further cites to numerous sections in the plan that refer to specific days as evidence that its use of "monthly" instead of a specific number of days was a deliberate choice of an ambiguous term such that the term should be interpreted in plaintiff's favor. Defendant counters that the term "monthly" unambiguously refers to the immediately preceding 30 day period; otherwise, the words "rate" and "right before" would be superfluous. Moreover, defendant argues that its interpretation ensures uniformity among plan participants in that for all claimants the relevant period is 30 days whereas, under plaintiff's interpretation, some participants will have only a 28 day prior period (February) and others will have a 31 day prior period (e.g., January).

■■■ The parties contest whether "monthly" is ambiguous, but the reason for this dispute is not clear. Plaintiff assumes that ambiguous terms must be construed in the insured's favor pursuant to the contract interpretation doctrine of *contra proferentem*. That assumption is correct when the applicable standard of review is de novo. *See Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 541 (9th Cir.1990). When, as here, the applicable standard of review is abuse of discretion, plaintiff's assumption is incorrect. In *Winters v. Costco Wholesale Corp.*, 49 F.3d 550 (9th Cir.1995), the court found that relying on *contra proferentem* is "not proper" when a plan explicitly grants a fiduciary the discretion to interpret the plan. *Winters*, 49 F.3d at 554. The rationale is clear: since the policy states how its terms should be interpreted, the rule of *contra proferentem* is displaced. *Id.* Therefore, under the

most faithful reading of *Winters*, when abuse of discretion is the standard, the court should not upset a plan administrator's construction of a term, even if the term is ambiguous, unless the construction conflicts with the plan's plain language. *See Winters*, 49 F.3d at 553–54.

■■■ With that approach in mind, the term "monthly" *is* ambiguous. A term is ambiguous if it is "susceptible of two or more distinct meanings." *Atwood*, 45 F.3d at 1324. "Monthly" is subject to the two reasonable interpretations advanced by these parties. Defendant's contention that "right before" becomes superfluous under plaintiff's interpretation is off-base. "Right before" could refer to the calender month "right before" or the 30 day period "right before." The Court cannot conceive of any reason why, as defendant suggests, "rate" becomes superfluous if the relevant time period is the 30 days right before but not if it is the calendar month right before.

Although "monthly" is ambiguous, defendant's interpretation of it does not conflict with the plan's plain language. Concluding that "monthly" means the 30 day period that ends the day before the disability begins does not conflict with the term "right before." Although 30 days is a gloss on "month," it is not in conflict with the word "month." Furthermore, although not dispositive, this interpretation of "monthly" corresponds with plaintiff's undisputed "standard practice." (Tyler Decl. in Support of Def.'s Mot. at ¶ 6). In sum, defendant simply was following a standard practice that apparently did not disadvantage plaintiff and that unquestionably was not precluded by the plain meaning of the plan.[3] Its construction was reasonable.

---

**3.** It bears noting that defendant's interpretation was not advantageous to it. If it had adopted plaintiff's interpretation, then plaintiff's earnings for the month of March were $9,526.10 (the combination of the three checks bearing a March date: $4,343.49, $198.60, and $4994.00). Defendant's interpretation of the term "monthly," however, resulted in attributing $15,327.59 to plaintiff

as his prior monthly earnings, largely on the basis of an early April check for $10,333.59. When viewed in this light, defendant's interpretation is against rather than for its self-interest.

Only if defendant adopted plaintiff's definition of "earnings," which defendant did not adopt, does its definition of "monthly" become important. Even then, plaintiff fails to

■ The second issue is whether defendant's construction of "earnings" was unreasonable. As disclosed in the table above, plaintiff claims, as part of his March income, $13,200 in unearned advances. Under plaintiff's profit-sharing agreement with his law firm, he received monthly advances of $6,600. (Decl. of J. Ronald Pengilly in Support of Pl.'s Mot. at 4). Pettit also advanced payments on plaintiff's behalf to Wood Island Associates for investment management services and to an unknown payee for plaintiff's insurance. (Krause Decl. in Support of Def.'s Mot., Ex. G at D–00235). In the instant dispute, the $3,256.51 and $1,579.62 checks respectively reflect these payments. At the end of each quarter, Pettit would pay plaintiff 50% of the fees paid to Pettit & Martin that were generated by his legal services. *Id.* These quarterly checks reflected the 50% minus the $13,200 in unearned advances and the payments made on plaintiff's behalf for investment services and insurance. (Krause Decl. in Support of Def.'s Mot., Ex. G at D–00235). Plaintiff argues that *all* of the income generated by this 50% agreement for the first quarter of 1995 was part of his March income even though the two $6,660 payments, the $3,256.51 payment, and the $1,579.62 payment had been paid in January and February of 1995.

Plaintiff's theory is that the term "earnings" in the phrase "prior monthly earnings" includes both receipts and accruals. (Pl.'s Mot. at 9). As defined in the policy, "earnings" excludes "bonuses, commissions, expense accounts, overtime pay and any other extra compensation." (Selden Decl. in Support of Pl.'s Mot for Partial Summ.J., Ex. 1 at p. 5). Earnings are not otherwise specifically defined. The dictionary definition of earnings—"money earned; wages; profits" (*The Random House College Dictionary*, 1980 (Revised Edition))—offers little further insight.

Plaintiff's construction of "earnings" is unreasonable. When Pettit & Martin purchased LTD insurance on plaintiff's behalf, it listed $139,633.00 as plaintiff's yearly earnings. Based on its construction of "earnings," Guardian found plaintiff's monthly earnings to be $15,327.59, which would translate to an annual salary of $183,931.08—generously above the $139,-633.00 salary on which the premiums were based. Plaintiff's construction of "prior monthly earnings" would result in an annual salary exceeding $348,000.00. Viewed in this light, plaintiff's construction is unreasonable whereas Guardian's construction is eminently reasonable. Moreover, extending plaintiff's conclusion that "earnings" includes *both* receipts and accruals would result in the unreasonable conclusion that the $6,200 in advances are "earnings" *both* when those checks were received (January and February) *and* when that amount accrued to defendant at the end of the quarter.[4]

indicate how its calculation of earnings is impacted by defendant's definition of "monthly." For example, it may be that the accrual date under plaintiff's 50% agreement is in the latter half of March, in which case defendant's construction of "monthly" again would have no disadvantageous effect on the computation of plaintiff's predisability earnings.

4. Even if plaintiff is not contending that plaintiff is entitled both to his accruals and receipts, his construction is unreasonable. A stylized example reveals this to be the case. Imagine that a law partner's only income from Pettit was a quarterly payment consisting of 50% of the revenue that he generated for his law firm but that Pettit advanced

$5,000 a month in anticipation of these quarterly payments. Therefore, in both January and February, Pettit advanced $5,000 each month. In March, it computed the partner's quarterly payment, deducted the previous $10,000 payment, and then drafted a check for the difference—say $12,000. Under plaintiff's approach, if his disability commenced on April 1, then his prior monthly earnings were $22,000 since he did not "earn" this payment until the firm so decided in March. If the same plaintiff had been injured or *March* 1, however, then his prior monthly earning would be *zero* under this approach since he had not yet "earned" his $5,000 February payment. In short, plaintiff's construction would visit harsh and unreasonable conse-

In sum, defendant's construction of earnings reached a very reasonable (and generous) result. Moreover, it reached a result that does not conflict with the plain language of "earnings." In calculating plaintiff's earnings based on the checks that his employer issued during the time period in question, Guardian employed one reasonable interpretation of "earnings" given that the dictionary definition includes "wages; profits." Plaintiff has provided no evidence that defendant arbitrarily applied this construction nor has it demonstrated that such an approach runs counter to defendant's usual approach. The Court finds that defendant did not abuse its discretion in construing "earnings" as it did.

■ The third issue is whether the $1,479.58 payment qualifies as earnings. Plaintiff admits that this payment amount reflects the monthly retirement payment that he was to receive from his old law firm, Pettit. (Decl. of J. Ronald Pengilly in Support of Pl.'s Mot for Partial Summ.J. at 3). Plaintiff never received this payment in March 1995 because Petit had dissolved by that point. (Krause Decl. in Support of Def.'s Mot., Ex. G at D–00235). Defendant makes a very common sensical argument against including this payment in plaintiff's earnings: if Pettit had not dissolved, then plaintiff would have continued to receive this retirement payment regardless of his disability. Therefore, the LTD policy was not intended to insure against the loss of such earnings. Moreover, regardless of the definition of "monthly," plaintiff neither received nor accrued this retirement payment in the month right before the onset of his disability. Therefore, the Court finds that defendant reasonably reached the conclusion that this retirement payment was not part of plaintiff's earnings.

In light of these findings, the Court GRANTS defendant's motion for summary judgment on claim five and on claim six to the extent claim six is premised on defendant's calculation of plaintiff's benefits.

## B. Mental Illness or Physical Condition

■ Plaintiff moves the Court to conclude that "Plaintiff's disability is caused by a physical or organic sickness and, therefore, plaintiff's LTD benefits should have been paid for five years, not two, so long as he was totally disabled within the terms of the policy." (Pl.'s Mot. at 3). Defendant, meanwhile, moves for dismissal of plaintiff's sixth claim for relief on the grounds that plaintiff failed to exhaust his administrative remedies.

■ Under ERISA, a claimant must exhaust a plan's internal review procedures prior to bringing suit in federal court. *Diaz v. United Agric. Employee Welfare Benefit Plan and Trust*, 50 F.3d 1478, 1483 (9th Cir.1995). As a matter of sound policy, federal courts usually should enforce this exhaustion requirement. *See Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir.1980). The exhaustion requirement serves several important policies, including "the reduction of frivolous litigation, the promotion of consistent treatment of claims, the provision of a nonadversarial method of claims settlement, the minimization of costs of claim settlement and a proper reliance on administrative expertise." *Diaz*, 50 F.3d at 1483. Furthermore, "prior fully considered actions by ... trustees interpreting their plans and perhaps also further refining and defining the problem in given cases, may well assist the courts when they are called upon to resolve the controversies." *Amato*, 618 F.2d at 568.

quences on ⅔ of beneficiaries (the ones whose disabilities commenced in any of the eight months that do not follow March, June, September, or December).

In the instant case, Guardian's policy described the claims appeal process as follows:

> If a claim is denied, The Guardian will provide to the Plan Administrator, for delivery to the claimant, a notice that will set forth:
>
> (1) the specific reason(s) the claim was denied;
>
> (2) specific references to the pertinent plan provision on which the denial is based;
>
> (3) a description of any additional material or information needed to make the claim valid, and an explanation of why the material or information is needed;
>
> (4) an explanation of the plan's claim review procedure.
>
> A claimant must file a request for review of a denied claim within 60 days after receipt of written notification of a denial of a claim.

Plaintiff contends that defendant failed to comply with this requirement by neglecting to explain the plan's claim review procedure in its final denial. Furthermore, the parties dispute the date that plaintiff's claim was "denied."

As an initial matter, the Court is not persuaded that plaintiff ever made a "claim" that his condition was a physical one. In the Attending Physician's Statement for Long Term Disability that, as required, accompanied plaintiff's claim for benefits, Dr. Ellen Haller reported a diagnosis of "major depression, single episode, severe with psychotic features." (Sigman Decl. in Support o Def.'s Opposition to Pl.'s Motion for Summ.J., Ex. A). Dr. Haller marked the degree of plaintiff's *mental* impairment as Class 5 (severe) but noted no impairment in the section pertaining to a *physical* impairment. *Id.* Likewise, plaintiff on his Long Term Disability Supplemental Form responded "N/A" to a question asking him to describe his physical condition. (Sigman Decl. in Support o Def.'s Opposition to Pl.'s Motion for Summ.J., Ex. B). On the other hand, Guardian's Training Manual requires the claims administrator to establish that the "mental illness is not primarily due to a physical/organic disorder." (Pl.'s Mot., Ex. 39). Pursuant to the Training Manual, therefore, claiming a depressive disorder touches off an investigation into whether the disorder is mental or physical. Accordingly, plaintiff argues that he claimed a physical condition when he listed a mental condition. (Pl.'s Oppn at 6).

Even if plaintiff claimed a physical condition, however, he still failed to exhaust his administrative review. Guardian finally denied, wholly or partially, plaintiff's claim on July 24, 1997. In a letter bearing that date, Guardian explained to plaintiff that it had reviewed its June 24, 1997 calculation of $15,327.59 as constituting plaintiff's "prior monthly earnings" and had determined that that figure was correct.[5] (Pl.'s Mot., Ex. 27). Pursuant to

---

5. Guardian soon sent two subsequent communications. In the first, dated August 27, 1997, it informed plaintiff that it had transposed two numbers, leading to an underpayment of $1,834.86. (Pl.'s Mot, Ex. 30). That communication in no way undermined the July 24 letter's conclusion that the method of calculation employed by Guardian in the June 24 letter was correct. The second communication was by Senior Attorney Alexander Whitaker on October 2, 1997. In it, he noted that he had been away on leave of absence. On his return, he had reviewed plaintiff's papers, and he concurred with the conclusion outlined in the June 24 letter. (Pl.'s Mot., Ex. 31). This letter very reasonably might communicate to an individual that the review was ongoing. Very significantly, however, this communication occurred more than 60 days **after** the July 24 letter. In other words, Mr. Whitaker's letter in no way lulled plaintiff into the false impression that his two months for appealing the denial commenced with his letter. Given the clear reaffirmation of the June 24 letter in the July 24 letter, plaintiff's failure to act within 60 days of receiving the July 24 letter constituted a failure to exhaust his administrative remedies. Furthermore, this issue is irrelevant since the Court finds, *infra*, that plaintiff did not request leave to file an appeal of the mental illness issue until February of 1998, well more than 60 days after he

the plan's claim review procedure, plaintiff needed to file his request for appeal of this decision within 60 days of receiving the July 24 letter.

■ In finding that the July 24, 1997, letter constituted the denial of plaintiff's claim of a physical condition, the Court finds that this letter failed, as required by the terms of the plan, to state an explanation of the plan's claim review procedure. However, the Ninth Circuit does not presume that procedural violations result in substantive harm. *See McKenzie v. General Tel. Co. of California*, 41 F.3d 1310, 1315 (9th Cir.1994). Instead, district courts should determine whether the procedural violation "prejudice[d] [a plaintiff's] opportunity to obtain a full and fair review of his claim." *Id.* at 1316. In *McKenzie*, the court found that the defendant insurance company's failure to disclose in a timely manner certain provisions of its disability plan did not prejudice plaintiff's opportunity for a full and fair review since defendant subsequently (*prior* to his review process) provided him with adequate notice of the relevant provision. *Id.* at 1315–16.

As in *McKenzie*, the fact that plaintiff in the instant case had previously received

notice otherwise of the appeal process undermines any claim of substantive harm arising from defendant's failure to provide notice in the July 24 letter. In a November 6, 1996 letter, more than eight months prior to the July 24 letter, Guardian had informed plaintiff of the claim review procedure.[6] Plaintiff not only knew of this review process prior to July 24, 1997; he also had successfully utilized it by submitting a timely request for review, dated November 22, 1996, which achieved a favorable reversal by Guardian in its January 6, 1997 letter. Furthermore, plaintiff had practiced as an attorney for nearly four decades. His son, also an attorney, assisted him in the spring of 1997 in initiating further appeals. Viewing the totality of circumstances, the Court finds that the November 6, 1996 letter provided plaintiff adequate notice of the appeal process. He has failed to raise a triable issue of fact regarding substantive harm.[7]

Returning to an earlier finding, plaintiff had 60 days from receiving the July 24, 1997 letter to request an appeal of the mental condition issue. Plaintiff contends that he requested this appeal in his letter dated October 21, 1997.[8] In that letter, however, plaintiff never requested an appeal of defendant's characterization of

---

would have received the October 2, 1997 letter from Mr. Whitaker.

**6.** In that letter, Guardian stated: "You have the right to request a review of your claim and the decision stated in this letter by making application to Guardian. Your request for review together with any additional information should be submitted to us within 60 days of receipt of this letter. The Guardian will notify you of its review."

**7.** If this Court had determined that Guardian's procedural inadequacy prejudiced plaintiff's opportunity for a full and fair review, then the Court would have remanded the issue of whether plaintiff's condition was a physical one to the Claims Fiduciary. *See White v. Jacobs Eng'g Group Long Term Dis-*

*ability Benefit Plan*, 896 F.2d 344, 352 (9th Cir.1990) (remanding to district court with instructions to remand to disability plan's appeals board after finding that plan administrator had provided inadequate notice of the reasons for denying plaintiff's claim). Such a remand would have a significant benefit. Guardian never articulated in any of its letters to plaintiff its specific reasons for classifying plaintiff's condition as a mental one. Therefore, this Court would rob itself of the benefits of the administrative review process—such as the refinement and winnowing of issues and the considered and thoughtful analysis of an administrative expert on these issues—if it did not remand the issue to the Claims Fiduciary.

**8.** The Court notes that even this October letter is well beyond the 60 day window.

plaintiff's condition as a mental one; rather, plaintiff asked:

> Will the Guardian reinstate Mr. Pengilly's disability benefits, until his 65th birthday, as such benefits would have continued to his 65th birthday if his disability were a physical, rather than a mental or emotional one? We contend the Guardian's disparate treatment of disabilities caused by mental or emotional conditions is a violation of the Title III of the Americans with Disabilities Act.

(Pl.'s Mot., Ex. 32). The sentence following the question reveals that plaintiff's claim that treating mental and physical conditions disparately violates the Americans with Disabilities Act is his reason for asking Guardian to extend his benefits to age 65. Accordingly, this second sentence demonstrates that plaintiff is *not* requesting an appeal of Guardian's decision to classify his condition as a mental one.

Finally, on February 3, 1998, plaintiff unequivocally requested an appeal of defendant's "mental illness" decision. In a letter bearing that date, plaintiff alleged that major depression is a "biological brain disease" and is thus a "physical condition, not a mental one." (Pl.'s Mot., Ex. 35). The letter asked defendant to inform plaintiff if it was inclined to reconsider plaintiff's classification. In a February 20, 1998 letter, defendant expressed its intention not to reconsider this decision. Because plaintiff's February 3 letter was more than 60 days (actually, more than seven months) after defendant finally denied in part plaintiff's claim, plaintiff failed to comply with Guardian's internal review procedures.[9]

In sum, plaintiff's appeal was late. Therefore, plaintiff failed to exhaust his administrative remedies, thus undermining the numerous virtues of the exhaustion process. In light of this failure to exhaust, the Court GRANTS defendant's motion for summary judgment on plaintiff's sixth cause of action to the extent it seeks disability benefits based on defendant's classification of plaintiff's condition as mental rather than physical. *See Diaz,* 50 F.3d at 1486 (affirming the district court's grant of summary judgment to defendant on plaintiff's ERISA claim on grounds that plaintiff failed to exhaust the plan's internal administrative remedies).[10]

## C. *Varity* Action

■ In his seventh claim for relief, plaintiff alleges that Guardian breached its fiduciary duty by construing its disability benefits in a variety of ways to the detriment of employees. On behalf of himself and others similarly situated, he seeks restitution or a constructive trust and an injunction. Plaintiff styles this action as a "varity" action, which refers to *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996). In that case, the Court held that "an individual beneficiary may bring suit against a plan administrator for a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3)." *Forsyth v. Humana, Inc.,* 114 F.3d 1467, 1474 (9th Cir.1997). Title 29, United States Code, Section 1132(a)(3) permits a participant or beneficiary to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the

---

**9.** The Court further notes that this February letter came approximately seven months *after* plaintiff's monthly benefit check had ceased.

**10.** In light of this finding, the Court does not consider the merits of plaintiff's "claim" of a physical condition. Accordingly, the Court overrules as moot defendant's objection to Dr. Levy's Declaration, which declaration related to the issue of whether plaintiff's condition was physical or mental.

terms of this plan." *Varity* interpreted this provision as a "catchall" provision that acts "as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." *Varity,* 516 U.S. at 512, 116 S.Ct. 1065. For example, in *Varity,* the Court found that § 1132(a)(3) provided an appropriate basis for plaintiffs to bring suit in that plaintiffs could not proceed under (a)(1) because they were no longer members of the plan and thus had no "benefits due [them] under the terms of the plan" nor could they proceed under (a)(2) because that section offered no remedy for individual beneficiaries. *Id.* at 515, 116 S.Ct. 1065.

In the instant case, (a)(1)(B) already provides plaintiff an adequate remedy if in fact Guardian has deprived him of benefits due him under his ERISA plan. Unlike the plaintiff in *Varity,* nothing bars him from proceeding under (a)(1). Therefore, the safety net of (a)(3) is not needed by plaintiff.

Plaintiff also brings his *Varity* claim on behalf of others similarly situated. Taking this language literally, the others "similarly situated" also would have access to (a)(1)(B) and thus would not require (a)(3)'s safety net. Furthermore, plaintiff has not presented any evidence that there are others similarly situated. The Court has no basis on which to conclude that these others could be joined in this case.

The Court GRANTS defendant's motion to dismiss plaintiff's seventh cause of action.[11]

## *V. CONCLUSION*

Because the evidence is undisputed that defendant's construction of the term "monthly earnings" was reasonable and did not conflict with the plain meaning of that term, the Court GRANTS defendant's motion for summary judgment on plaintiff's fifth cause of action and on plaintiff's sixth cause of action to the extent it involves defendant's calculation of plaintiff's monthly benefits.

Because plaintiff failed to exhaust the plan's internal administrative remedies, the Court GRANTS defendant's motion for summary judgment on plaintiff's sixth cause of action to the extent it seeks disability benefits based on defendant's classification of plaintiff's condition as mental rather than physical.

Because plaintiff may not bring a *Varity* claim when, as here, he has an adequate remedy under 29 U.S.C. § 1132(a)(1)(B), the Court GRANTS defendant's motion to dismiss plaintiff's seventh cause of action.

IT IS SO ORDERED.

---

**11.** In his opposition, plaintiff failed to respond to defendant's attack on this seventh claim for relief. Instead, in the space he designated on his brief for his response, plaintiff merely restated the standard for summary judgment.